## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 95-154-2 (BAH) |
| CALVIN SUMLER, | Chief Judge Beryl A. Howell |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Defendant Calvin Sumler led "the so-called Fern Street Crew, an organization which distributed crack cocaine for seven years in the District of Columbia and Maryland" between 1988 and 1995. *United States v. Sumler*, 136 F.3d 188, 189 (D.C. Cir. 1998). The organization was responsible for distributing, according to a conservative estimate, over 50 kilograms of crack cocaine, Presentence Investigation Report ("PSR") ¶¶ 154–55, ECF No. 685 (sealed), and its activities "were facilitated by its use of violence to defend territory from rival drug dealers and subvert the efforts of the criminal justice system," *Sumler*, 136 F.3d at 189. [1] Eventually, law enforcement's investigation into the violence and drug dealing by this organization led to the indictment of defendant and eleven of his co-conspirators, Indictment, ECF No. 4. In 1996, after a four-month trial against defendant and four co-defendants, a jury found the defendants guilty of "numerous offenses, including murder, armed robbery, kidnapping, and drug and RICO conspiracies." *Id.* at 189. [2] Defendant himself was "convicted of one count of premeditated first

---

[1] The PSR is filed under seal and unsealed to the limited extent that sealed content is referenced in this Memorandum Opinion to explain the Court's reasoning. *See United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009).

[2] Defendant was joined at trial with co-defendants Michael Jefferson, Gerald Smith, Vernon Washington, and Larry Walker, Jr., while seven other defendants entered guilty pleas pursuant to cooperation agreements. *See* Gov't's Suppl. Resp. to Court's June 9, 2021 Order at 5-7, ECF No. 675 (identifying the following defendants as entering cooperation agreements: Antonio Avery, Kahron Sarter, Raymond Harris, George Townsend, Gregory Alston, Aaron Rogers, and Verna Perry).

degree murder while armed," *id.* at 189 n.2, as well as racketeering conspiracy, continuing criminal enterprise, and drug trafficking offenses.  The same year, defendant was sentenced to life in prison without the possibility of parole.[3]

Now, twenty-five years later, and with evidence of rehabilitation, defendant seeks a reduction in his sentence to time served or, at most, to 40 years' imprisonment.  Def.'s Suppl. Mot. to Reduce Sentence Pursuant to the First Step Act of 2018 ("Def.'s 404 Mot.") at 22, ECF No. 623.  To this end, defendant has two pending motions to reduce his sentence under separate statutory provisions. [4]  First, defendant moves to reduce his sentence under Section 404 of the First Step Act of 2018 ("First Step Act"), Pub. L. 115-391, 132 Stat. 5194, which makes retroactively available the more lenient penalties for certain crack cocaine offenses enacted in the Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372.  Def.'s 404 Mot.  Second, defendant moves for compassionate release, under 18 U.S.C. § 3582(c)(1)(A)(i), citing his chronic medical conditions and the ongoing COVID-19 pandemic.  Def.'s Emergency Mot. for Compassionate Release ("Def.'s Mot. Compassionate Release"), ECF No. 648.

For the reasons discussed below, defendant's motion for a reduced sentence under Section 404 of the First Step Act is denied since one of his convictions, for which he is serving a life sentence, is not covered by Section 404 of the First Step Act.  His motion for compassionate release is also denied.

---

[3]     This case was directly reassigned to the undersigned Chief Judge in October 2017, Min. Entry (Oct. 18, 2017), in accordance with the then-effective Local Rules, which provided for the Chief Judge to "dispose of matters requiring immediate action in criminal cases already assigned to any judge of the Court if that judge is unavailable or otherwise unable to hear the matters."  D.D.C. LCrR 57.14(6).  The Local Rules now provide that "[r]eassignment of any criminal case, and matters arising therefrom, previously assigned to a judge who no longer sits on the district court shall be made by random assignment."  LCrR 57.13(b) (amended Nov. 9, 2017).

[4]     Defendant previously filed *pro se* versions of each of these motions.  *See* Def.'s Mot. Seeking Retroactive Application of the Fair Sentencing Act in Light of the First Step Act of 2018, ECF No. 601 ("Def.'s *Pro Se* 404 Mot."); Def.'s Mot. to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) for Immediate Release ("Def.'s *Pro Se* Mot. Compassionate Release"), ECF No. 641.  The *pro se* motions were superseded by the motions filed by counsel and therefore denied as moot.  *See* Min. Order (June 9, 2021).

I.      **BACKGROUND**

As necessary context for the resolution of the pending motions, summarized below is background regarding the defendant's offense conduct, convictions, and sentences, largely drawn from the defendant's original sentencing hearing in 1996 and related documents, as well as judicial decisions in this case.  It is followed by an overview of the procedural history since the filing of the pending motions, including the testimony presented at a June 9, 2021, hearing requested by defendant, and post-hearing supplemental filings by both parties.

A.      **Defendant's Convictions**

Defendant was a leader of the Fern Street Crew, "an organization which distributed crack cocaine for seven years in the District of Columbia and Maryland." *Sumler*, 136 F.3d at 189. "The Crew's activities were facilitated by its use of violence to defend territory from rival drug dealers and subvert the efforts of the criminal justice system." *Id*.  Defendant purchased kilogram quantities of cocaine and then provided crack cocaine to others to distribute.  PSR ¶¶ 122–152.  Defendant was convicted of killing one person, Anthony Hinton, *id.* ¶¶ 84–87, and his organization extensively used "violence to defend territory from rival drug dealers," *Sumler*, 136 F.3d at 189.

In July 1995, defendant was charged in a 61-count indictment with 11 co-defendants. Indictment. [5]  Following a four-month trial, a jury found defendant guilty of the following eleven of the thirteen counts with which he was charged, with those counts of conviction carrying the penalties indicated at that time:

- **Count 1**: Conspiracy to Distribute and Possess with Intent to Distribute 50 Grams or More of Cocaine Base (21 U.S.C. §§ 846 and 841(b)(1)(A)(iii)) ("Crack Conspiracy")
  **Penalty**: mandatory minimum 10 years to life imprisonment;

---

[5]      A superseding indictment was filed in January 1996, Superseding Indictment, ECF No. 192, and a retyped superseding indictment was filed on July 26, 1996, Retyped Superseding Indictment, ECF No. 341.

- **Count 2**: Continuing Criminal Enterprise (21 U.S.C. § 848(a) and (b)) ("Super CCE")
  **Penalty**: mandatory minimum sentence of life imprisonment;
- **Count 3**: Conspiracy to Participate in Racketeer Influenced Corrupt Organization (18 U.S.C. § 1962(d) and 1963(a)) ("RICO conspiracy")
  **Penalty**: life imprisonment;
- **Count 4**: First Degree Murder While Armed (22 D.C. Code §§ 2401, 3202 & 105)
  **Penalty**: 20 years to life imprisonment;
- **Count 6**: Continuing Criminal Enterprise Murder (21 U.S.C. § 848(e)(l)(A)) ("CCE murder")
  **Penalty**: mandatory minimum 20 years to life imprisonment;
- **Count 19**: Use of a Firearm During and in Relation to a Crime of Violence or a Drug Trafficking Crime "on or about November 1, 1991 (CCE Murder of Anthony Hinton)" (18 U.S.C. § 924(c))
  **Penalty**:  mandatory consecutive 5 years' imprisonment;
- **Count 29**: Possession of a Firearm During a Crime of Violence (22 D.C. Code § 3204(b))
  **Penalty**: mandatory minimum 5 years to 15 years' imprisonment;
- **Counts 38 and 39**: Distribution of Cocaine Base (21 U.S.C. §§ 84l(a)(l) and 841(b)(l)(B)(iii))
  **Penalty**: mandatory minimum 5 years to 40 years' imprisonment on each count; and
- **Counts 40 and 41**: Distribution of Cocaine Base (21 U.S.C. §§ 84l(a)(l) and 841(b)(l)(A)(iii))
  **Penalty**: mandatory minimum 10 years to life imprisonment on each count.

Judgment and Commitment Order, ECF No. 445; PSR ¶¶ 250–258; Verdict Form, ECF No. 343.[6]

Pertinent to resolution of the pending motions is the quantity of narcotics found to be involved in each of the eight narcotics-related counts (Counts 1–3, 6, and 38–41).  The jury instructions on Count 1 and Counts 38–41 did not require the jury to find a specific quantity of crack cocaine, instructing instead that "the actual amount of a controlled substance involved or the amount alleged in the indictment is not an element of this Count," Trial Tr. (July 30, 1996) at 29:12–14, ECF No. 393 (referring to Count One), and that "[t]he government need not prove that

---

[6]     Defendant was acquitted of Counts 5 and 7, charging him with First Degree Felony Murder and Kidnapping While Armed, respectively.  Verdict Form at 5.

the defendant distributed any particular numerical amount of cocaine base," *id.* at 123:22–24 (referring to Counts 38–41).

For Count 2, the Super CCE drug charge, the jury was instructed that an element of the offense was that "the enterprise was involved in the distribution of quantities of a mixture or substance containing a detectable amount of cocaine base . . . and the amount of said mixture and substance was 1.5 kilograms or more." *Id.* at 54:16–20.  On that count, the jury found the defendant was guilty of the charged drug conspiracy and had illegally distributed crack cocaine on six occasions, including the four that formed the basis for drug distribution in Counts 38–41. Verdict Form at 2–3.

On Count 3, the RICO conspiracy charge, the jury found that defendant engaged in numerous predicate acts, including a conspiracy to distribute a controlled substance, unlawfully distributing crack cocaine on six occasions, and murdering Anthony Hinton.  *Id.* at 4–5.

On Count 6, the CCE murder charge, the jury found that defendant committed the "[i]ntentional murder of Anthony Hinton, while working in furtherance of a continuing criminal enterprise."  *Id.* at 5.  The jury had been instructed that an element of the offense was that "the defendant committed the killings or participated in the killings while engaged in or working in furtherance of a continuing criminal enterprise."  Trial Tr. (July 30, 1996) at 85:5–7.  The court had further instructed that "the government need not prove that the continuing criminal enterprise was responsible for the distribution of any particular or minimum amount of crack as required for Count 2 . . . [but that in] order to prove this element, it is sufficient for the government to prove that the defendant killed . . . the decedent while the defendant was engaged in or working in furtherance of a continued criminal enterprise."  *Id.* at 85:12–20.

B.      **Defendant's Sentencing**

Based on the evidence at trial, the PSR estimated that the defendant was responsible for distributing at least 50 kilograms of crack cocaine during the seven-year course of the conspiracy, PSR ¶ 155, but also indicated this quantity "substantially underestimate[d]" the amount of cocaine that defendant was responsible for distributing, *id.* ¶ 121.  Under the 1995 edition of the U.S. Sentencing Guidelines Manual, *id.* ¶ 192, the PSR grouped Counts 1, 2, and 3 (RICO drug overt acts), and Counts 38–41 under U.S.S.G. §3D1.2(d), *id.* ¶ 202 ("Group One"), and grouped Count 3 (RICO murder overt act) and Count 6 under §3D1.2(a), *id.* ¶ 208 ("Group Two").  Based on the trial testimony, distribution of over 50 kilograms of crack cocaine was attributed to defendant, which quantity provided a base offense level of 38, under U.S.S.G. § 2D1.1(a)(3)(c)(1).  *Id.* ¶ 202.  Defendant contested this quantity of drugs attributed to him in the PSR, contending that he was only responsible for the drugs involved in Counts 38, 39, 40, and 41, which would amount to 134.86 grams.  Sent'g Hr'g Tr. (Nov. 18, 1996) at 2:23–3:4, ECF No. 519; PSR at 50. [7]  In response, the government pointed out that defendant's position was inconsistent with the jury's conviction on Count 2, which required a finding that defendant's enterprise was responsible for distributing over 1.5 kilograms of crack cocaine, *see* Sent'g Hr'g Tr. at 2:19–24, 4:23–25, and the court concurred, stating, "I'm going to find that it's over 50 kilos," *id.* at 5:16–17.

For Group One, *i.e.,* Counts 1, 2, 3 (RICO drug overt acts), and 38–41, four levels were added to reflect the guideline for Super CCE, which was the count producing the highest offense

---

[7]      For the four distribution counts, Count 38 charged unlawful distribution of 13.64 grams of crack on June 23, 1994; Count 39 charged unlawful distribution of 12.42 grams of crack on July 22, 1994; Count 40 charged unlawful distribution of 53.06 grams of crack on August 11, 1994; and Count 41 charged unlawful distribution of 55.74 grams of crack on August 19, 1994, which together, totals 134.86 grams.  Retyped Superseding Indictment at 43–44.

level in Group One, and therefore driving the resulting offense level to 42.  PSR ¶ 202; U.S.S.G.

§ 2D1.5(a)(1).  Then two levels were added for firearm possession, under U.S.S.G.

§ 2D1.1(b)(1), and an additional two levels for obstruction of justice, under U.S.S.G. § 3C1.1,

resulting in an offense level of 46.  *Id.* ¶¶ 203, 206, 207.  For Group Two, *i.e.,* Counts 3 (RICO

murder overt act) and 6 (CCE murder), the PSR calculated a base offense level of 43, under

U.S.S.G. § 2A1.1, and added four levels for defendant's leadership role in the offense, under

U.S.S.G. § 3B1.1(a), for an adjusted offense level of 47.  *Id.* ¶¶ 208, 211, 213.  After a multiple-

count adjustment, the PSR calculated the total offense level to be 49.  *Id.* ¶ 218.  With a criminal

history score of 0, defendant's criminal history category was I and his mandatory sentencing

range under the then-applicable Guidelines was life.  *Id.* ¶¶ 222, 259.

At sentencing, the court vacated Count 1 (Crack Conspiracy) because the conduct that

formed the basis of that conviction was identical to the conduct establishing a necessary element

of Count 2 (Super CCE).  Min. Entry (Nov. 18, 1996); *see also* Sent'g Hr'g Tr. at 72:24–73:1.

The sentencing judge adopted the PSR drug quantity estimate, finding defendant was responsible

for "more than 50 kilos" of crack.  Sent'g Hr'g Tr. at 28:3–4.  Defendant was then sentenced to

life imprisonment on Counts 2, 3, 6, 40, and 41, to be followed by five years of supervised

release "if [he] should at any point be released," and to 40 years of imprisonment on Counts 38

and 39, to be followed by four years of supervised release, all to run concurrently.  Min. Entry

(Nov. 18, 1996); Sent'g Hr'g Tr. at 73:2–18.[8]

---

[8] Defendant was also sentenced, on Count 4, to 20 years to life imprisonment; on Count 29, to 5 to 15 years' imprisonment, to run concurrently to one another and to all other counts; and, on Count 19, 5 years' imprisonment, "to run consecutively to all other counts."  Judgment and Commitment Order at 3.  The parties agree that these counts are not at issue in seeking a sentence reduction, since the sentences on Counts 4 and 29 are already served and Count 19 must run consecutively to other counts.  *See* Def.'s 404 Mot. at 14 ("Exercising discretion under the First Step Act to remedy Mr. Sumler's life sentence, this Court should impose a reduced sentence of 20 years on Counts 2, 3, 6, 38, 39, 40, and 41, concurrent to the sentences already imposed on Counts 4 and 29, and consecutive to the 5 year sentence imposed on Count 19, for a total sentence of 25 years of imprisonment."); Gov't's Opp'n to

On appeal, defendant's convictions were affirmed by the D.C. Circuit, *see Sumler*, 136 F.3d at 192, and his subsequent collateral challenges to his convictions were denied, *see* Order (Jan. 13, 2000), ECF No. 548; Order (Mar. 5, 2018), ECF No. 596.  He remains incarcerated in the custody of the Bureau of Prisons serving a life sentence.

### C.      Defendant's Pending Motions and Hearing

Now, having spent over 25 years in prison, defendant seeks a sentence reduction to "25 years, and no more than forty years."  Def.'s 404 Mot. at 22, 37.  Defendant, proceeding *pro se*, first filed for relief under the First Step Act on March 7, 2019, Def.'s *Pro Se* 404 Mot., and that same day the Court ordered the government to respond, *see* Min. Order (Mar. 7, 2019).  Pursuant to the Court's Standing Order appointing the Office of the Federal Public Defender ("FPD") to represent indigent defendants in connection with motions under the First Step Act, *see Standing Order In Re First Step Act of 2018 (Public Law No. 115-391) Retroactive Application of Fair Sentencing Act* (Jan. 24, 2019), the government conferred with the FPD and the parties proposed a briefing schedule whereby defendant, now represented, would file a supplemental motion "within 5 months," given the complexity of the case.  Joint Status Rep., ECF No. 608.  What began as a seven-month long briefing schedule, *see* Min. Order (Apr. 29, 2019), eventually took eighteen months to complete, with defendant requesting, and the Court granting, three extensions of time to file his supplemental motion and reply, *see* Min. Order (Sept. 20, 2019); Min. Order (Nov. 20, 2019); Min. Order (Aug. 10, 2020), and the government seeking, and the Court

---

Def.'s Suppl. Mot. to Reduce Sentence ("Gov't's 404 Opp'n") at 8, ECF No. 637 ("[Defendant] does not assert that he is eligible based on count 4 (first-degree murder while armed), count 19 (§ 924(c)), and count 29 (PFCOV); the government agrees that the defendant is not eligible based on these counts.").  Indeed, the First Step Act does not authorize "reductions of already-completed sentences."  *United States v. Winston*, No. 1:95-cr-7 (RCL), 2020 WL 7342620, at *1 (D.D.C. Dec. 14, 2020) (internal quotations omitted); *see also United States v. Martin*, 974 F.3d 124, 138, 140 (2d Cir. 2020) (holding that "[t]he First Step Act does not authorize district courts to reduce sentences for covered offenses where those sentences have been fully served," explaining that "[t]he text of the statute permits only the 'impos[ition] of a reduced sentence,' from which we cannot also imply an authorization to reduce a term of imprisonment that has already been served.").

granting, four deadline extensions to file its opposition to defendant's motion, *see* Min. Order (Jan. 29, 2020); Min. Order (Apr. 2, 2020); Min. Order (May 14, 2020); Min. Order (July 13, 2020).  Scheduled briefing was finally complete on October 30, 2020, nineteen months after defendant first filed his *pro se* motion.  Def.'s Reply in Supp. of Mot. to Reduce Sentence Pursuant to the First Step Act of 2018 ("Def.'s 404 Reply"), ECF No. 644.

Over the course of briefing the First Step Act motion, defendant filed letters with the Court asking, for example, for a new attorney to address his case more quickly, *see* Def.'s Apr. 16, 2019 Letter, ECF No. 607, to which the Court responded, *see* Min. Order (Apr. 29, 2019) (denying defendant's request for a new attorney given the "unlikel[ihood]" that new counsel could file the supplement sooner).  Along with the scheduled briefing, defendant also filed *pro se* a supplemental motion arguing for a reduction in sentence based on his conviction under 18 U.S.C. § 924(c), *see* Def.'s *Pro Se* Suppl. Mot., ECF No. 636, and a second, counseled supplemental motion, with additional exhibits, for the same relief, *see* Def.'s 2d Suppl. to Reply in Supp. of Section 404 Mot. ("Def.'s 2d Suppl. 404 Reply"), ECF No. 666.[9]

Before briefing on the First Step Act motion was complete, defendant also filed a *pro se* motion for compassionate release in September 2020.  Def.'s *Pro Se* Mot. Compassionate Release.  FPD then filed a supplemental, counseled motion on November 12, 2020.  Def.'s Mot.

---

[9]      In his *pro se* supplemental motion, defendant relied on *United States v. Davis*, 139 S.Ct. 2319, 2336 (2019) (holding the residual clause of 18 U.S.C. § 924(c)(3)(B) "unconstitutionally vague"), to seek "permission to present this issue" challenging his conviction under 18 U.S.C. § 924(c).  Def.'s *Pro Se* Suppl. Mot. at 1.  Defendant was charged under 18 U.S.C. §§ 924(c)(1) and (c)(2) for using a weapon in connection with the CCE murder charged in Count 6, *see* Retyped Superseding Indictment at 2, 40, which is defined as a "drug trafficking crime" under 18 U.S.C. § 924(c)(2).  Defendant's conviction thus involves only the first two subsections of § 924(c), which were not at issue in *Davis*.  Defendant does not pursue this challenge to Count 19 in his briefing for a sentence reduction under the First Step Act, *see* Def.'s 404 Mot. at 14 ("to remedy Mr. Sumler's life sentence, this Court should impose a reduced sentence of 20 years on Counts 2, 3, 6, 38, 39, 40, and 41, concurrent to the sentences already imposed on Counts 4 and 29, and consecutive to the 5 year sentence imposed on Count 19, for a total sentence of 25 years of imprisonment").  Furthermore, the Fair Sentencing Act did not amend the penalty section of § 924(c), so it is not a covered offense under the First Step Act.  *See Terry v. United States*, 141 S.Ct. 1858, 1863 (2021).  This request is therefore denied.

Compassionate Release.  After deadline extensions were granted to both parties, *see* Min. Order (Nov. 12, 2020); Min. Order (Dec. 1, 2020); Min. Order (Dec. 7, 2020), briefing on the compassionate release motion was completed on December 14, 2020, although defendant subsequently filed two supplemental pleadings with additional exhibits.  *See* Def.'s Suppl. Evidence in Supp. of Compassionate Release ("Def.'s 1st Suppl. Evidence Supp. Compassionate Release"), ECF No. 656; Def.'s Notice of Suppl. Authority and Suppl. Evidence Supp. Compassionate Release ("Def.'s Notice and 2d Suppl. Supp. Compassionate Release"), ECF No. 667.  Over the course of briefing this compassionate release motion, defendant also filed three additional letters disputing his conviction for Anthony Hinton's murder and asserting his innocence, *see* Def.'s Sept. 21, 2020 Letter to Court, ECF No. 654; Def.'s Nov. 17, 2020 Letter to Court, ECF No. 653; Def.'s Dec. 28, 2020 Letter to Court, ECF No. 659, which, along with the hearing testimony, ultimately prompted the Court to request additional information regarding the evidentiary basis for defendant's conviction of Anthony Hinton's murder, *see* Min. Order (June 9, 2021).

Given the violence, including murder, associated with defendant's offense conduct and convictions, and defendant's repeated requests for a hearing, *see, e.g.,* Def.'s 404 Mot. at 42; Def.'s 404 Reply at 23; Def.'s Mot. Compassionate Release at 63; Def.'s Reply in Supp. Of Emergency Mot. for Compassionate Release ("Def.'s Reply Supp. Compassionate Release") at 30, ECF No. 652, the Court sought confirmation from the government about compliance "with the applicable provisions of 18 U.S.C. § 3771 regarding the rights of crime victims, particularly with respect to the murder victim."  Min. Order (Mar. 1, 2021); *see also* 18 U.S.C. § 3771(a)(4) (granting crime victim "[t]he right to be reasonably heard at any public proceeding in the district court involving release, . . . sentencing, or any parole proceeding"); *id*. §3771(c)(1)(requiring

prosecutors to "make their best efforts to see that crime victims are notified of, and accorded, the right described in subsection (a)").  In addition, in light of a factual assertion made by defendant in his reply supporting his First Step Act motion about the government's pre-trial plea offer, *see* Def.'s 404 Reply at 23, which assertion was not otherwise supported in the record, the Court asked the government "whether it contests that it offered defendant a binding plea agreement of 30 years of imprisonment before he went to trial."  Min. Order (Mar. 1, 2021).

In response to the Court's inquiry about compliance with § 3771, the government indicated that "due to an inadvertent oversight" it had not contacted defendant's victims or their surviving family members regarding his compassionate release motion and requested more time to comply with its statutory obligations under § 3771.  Gov't's Resp. to Court's Mar. 1, 2021 Min. Order at 2, ECF No. 660.  Eventually, the government advised that about fifteen victims or survivors of defendant's conspiracy had been identified and would be notified of the pendency of the motions to provide any victim impact statement.  Gov't's Resp. to Apr. 23, 2021 Order at 3–4, ECF No. 670.  No victim impact statement was submitted.

As to defendant's assertion regarding a plea offer, the government indicated that one of the trial prosecutors had been contacted and "recalled that a plea offer was made to this defendant . . . pursuant to Rule 11(c)(1)(C)" but "was unable to recall the exact terms of the plea" and "did not have 100% confidence in his recollections."  Gov't's Further Resp. to Court's Mar. 1, 2021 Min. Order at 3, ECF No. 662.  The government was unable "to locate any copy of any written plea offer made to defendant" in the closed trial files that it had been able to retrieve, and asked for another extension to continue to review.  *Id.* at 3–4.  The government never located any reference to a plea offer in the preserved trial documents.  Gov't's 2d Suppl. Resp. to Court's Mar. 1, 2021 Min. Order, ECF No. 664.  Defendant then supplemented his position with a

declaration from defendant's trial attorney regarding the plea offer.  Def.'s Suppl. to Reply in Supp. of Section 404 Mot., ECF No. 665.

In the wake of the D.C. Circuit's decision in *United States v. White*, 984 F.3d 76 (D.C. Cir. 2020), defendant, in a supplemental filing, insisted that he was entitled to a hearing before his First Step Act motion was decided.  Def.'s 2d Suppl. 404 Reply at 3.  Indeed, while every Circuit to address this issue has held that Section 404 does not require a full resentencing hearing, *see United States v. Easter*, 975 F.3d 318, 326 (3d Cir. 2020) (collecting cases); *see also United States v. Smith*, 982 F.3d 106, 113 (2d Cir. 2020) (per curiam) ("[A] district court is not categorically required to hold a hearing at which the defendant is present before denying a motion for a sentence reduction under Section 404."), this Court acknowledged that *White* contained language suggesting otherwise, Min. Order (Apr. 23, 2021) (quoting *White*, 984 F.3d at 81, that "[i]t is important that [defendants] be given full and fair hearings on their claims to ensure that the goals of the [First Step] Act are met").  Noting that "defendant [had] previously conceded that a hearing on his motion was "not required," Min. Order (Apr. 23, 2021) (citing Def.'s 404. Mot. at 42), but appeared to take the contrary position in his most recent filing, *id.*, the Court directed the parties to clarify their position on the necessity of a hearing and provide additional specified information about the evidence to be presented at such a hearing that had not already been presented in extensive briefing and exhibits, *id*.

Defendant responded that "a full resentencing hearing" was not required but "should" be held.  Def.'s Resp. to Court's Apr. 23, 2021 Min. Order at 1, ECF No. 668.  The government tersely recommended that the Court hold a hearing "if it believes that such a hearing would be helpful in the exercise of the Court's discretion . . . ."  Gov't's Resp. to Apr. 23, 2021 Order at 3. The parties were then directed to address at a hearing various issues raised by defendant's

motions, including (1) the efforts made by the government to contact the victims and survivors it had identified, Min. Order (May 4, 2021); (2) who those victims and survivors were, *id*.; (3) how those victims and survivors were affected by defendant's actions or the conspiracy in which he was involved, *id*.; and (4) information relevant to the Court's consideration of 18 U.S.C. § 3553(a)(6) ("avoid[ing] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"), in particular, for each of defendant's co-defendants, the sentence imposed for each count of conviction, role in the criminal enterprise in comparison to defendant, and current incarceration status, Min. Order (June 7, 2021).

At the hearing requested by defendant and held on June 9, 2021, defendant testified, along with six other witnesses. Defendant stood by his earlier claim that he "did not kill, command, or induce the murder of Anthony Hinton" and that his conviction for that offense was a "mountain of lies . . . manufactured" by the government. Def.'s Aug. 22, 2019 Letter to Court, ECF No. 616; *see also* Rough Transcript of Hearing (June 9, 2021) ("June 9, 2021 Hr'g Tr. (Rough)") at 36:20–24. [10] Other witnesses attested to defendant's rehabilitation but also challenged the basis for defendant's convictions, including for the murder of Anthony Hinton. For example, defendant's fiancé Yolanda Tyler testified that defendant "is not the type of man to commit a crime like [murder]," June 9, 2021 Hr'g Tr. (Rough) at 42:1–3, that at trial "a number" of people had "come forth and had to testify and []had lied on him," *id.* at 44:23–25, and that she knew Hinton's sister, who had told her that "she never believed Calvin had anything to do with" her brother's death, *id.* at 42:16–19, 44:12–19. Defendant's friend Tommy Walker, who said he had been "sentenced to actually three life sentences" and served 25 years before being released,

---

[10]     All citations to the June 9, 2021, hearing transcript cite to a rough draft of the transcript, since the court reporter has not made a final transcript available. Discrepancies in page numbers between the rough and final transcripts may exist.

*id.* 45:23–25, testified he "felt the same way [defendant] did, . . . 100 percent sure that [he] was innocent" and also challenged the convictions due to witnesses being paid for their testimony, "saying what the prosecutor wants to hear, [and] fabricating the case." *Id.* at 47:15–48:9. While defendant acknowledged his guilt for, and harm to the community caused by, his drug trafficking offenses, *id.* at 33:8–14 ("I'm shamed and embarrassed for selling drugs and I would like to make amends for it. I do have first-hand knowledge of the negative effects that drugs have on people and society."), nowhere in defendant's letters nor at the hearing did he indicate any remorse, concern, or sympathy for the violence, including murders and assaults, meted out to many individuals by the drug organization he led. In this respect and compounded by his denial of guilt for the murder of Anthony Hinton, the hearing undercut, rather than helped demonstrate, that defendant had accepted full responsibility for his offense conduct and thereby raised questions about his claim that he had been fully rehabilitated and was ready for reentry into the community with the appropriate respect for and willingness to comply with the law. *See United States v. Resto*, Nos. 20-3350, 20-3351, 2021 WL 5492809, at *1, 3 (3d Cir. Nov. 23, 2021) (affirming denial of defendants' First Step Act sentence reduction motions despite defendants' "commendable rehabilitation efforts while incarcerated," citing "their involvement in violent crimes" and "that neither defendant had sufficient remorse regarding their criminal conduct," in particular noting that defendants' letters "neither mentioned their involvement in murder(s) nor the devastation that their conduct caused to the victims' families.").

In light of defendant's adamant denial that he was guilty of murder, the Court asked the government to provide a basic overview of the evidence presented at trial supporting defendant's conviction for Hinton's murder, including the number of witnesses presented and whether there were eyewitnesses. June 9, 2021 Hr'g Tr. (Rough) at 21:1–22:21. The government was unable

to provide this information at the hearing but requested an opportunity to submit supplemental briefing. *Id.*; *see also* Min. Order (June 9, 2021). [11] The last of that briefing was submitted on October 1, 2021, and defendant's motions are now ripe for resolution.

---

[11] Defendant asserts that "[h]e has maintained his innocence from the beginning, and rejected a 30-year plea deal for the very reason that it would have required him to plead guilty to the Hinton murder." Def.'s Reply to Gov't's Suppl. Resp. at 3, 12, ECF No. 683. In defendant's view, he should be granted release "irrespective of his guilt or innocence of the Hinton murder," *id.* at 1, using the authority of the First Step Act to undo the life sentences he received for this murder when, as the government correctly points out, he failed to raise his claim of innocence as to the Hinton murder either on direct appeal or in his first Section 2255 motion alleging, *inter alia*, ineffective assistance of counsel, *see* Gov't's Suppl. Resp. to Court's June 9, 2021 Order at 1 n.1. This is an extraordinary request. The government summarized the evidence from eight witnesses at trial presented in support of defendant's conviction for the Hinton murder, which was committed on October 31, 1991, and attempted murder the same night of Hinton's brother, Raymond "Biggie" Harris. These witnesses included (1) a bystander who heard gunshots the night of the murder and discovered Hinton's body the next morning; (2) six members of defendant's drug organization (Gregory Alston, Raymond "Biggie" Harris, Aaron Rogers, Ralph Stancil, Johnny Thornton, and George Townsend); and (3) Lenwood Brooks, a junkie also accused, like Hinton, of "messing up" the neighborhood and interfering with drug sales. *Id.* at 2-4. This testimony from multiple witnesses (1) relayed defendant's statements that defendant expected Hinton to testify against two other members of defendant's organization, Michael Jefferson and Aaron Rogers; that Hinton's conduct was interfering with drug sales; that Hinton should be killed; that Rogers did not need to worry about Hinton's testimony; and, on the night of the murder, defendant's statement "Let's clean up the Avenue tonight," which Stancil "interpreted as a directive to attack Hinton and others who have been 'messing up' the neighborhood;" (2) described defendant picking up his 9mm pistol from Thornton the night of the murder, as testified to by Thornton, and Stancil's statements about later meeting with defendant and others to find Hinton and Brooks; (3) detailed the actual murder, starting with Stancil tricking Hinton and Brooks into getting into a car to drive to an alley, where Stancil pulled Brooks from the car and beat him up, before Brooks ran out of the alley, and then defendant shot Hinton, who turned and ran, with defendant chasing him and firing several more shots, along with Stancil, who also inculpated himself in the murder by testifying that he, too, fired two or three shots at Hinton; (4) described the attempted murder of Hinton's brother Harris the same night, with defendant slashing Harris' car tires and then waiting on a path that Harris would ordinarily use to walk home, but Harris "foiled the plan by driving his car" with the flat tires; and (5) Stancil reporting that, the day after the murder, defendant gave Stancil a discount on the regular price for crack cocaine after his participation in Hinton's murder. *Id.* Defendant disputes that this trial evidence "conclusively establish[es] that Mr. Sumler killed Anthony Hinton," Def.'s Reply to Gov't's Suppl. Resp. at 12, relying on what he characterizes as "key inconsistencies presented at trial," *id.* 6; *see also id.* 6-12. The fact remains, however, that the jury convicted defendant of Hinton's murder based on consideration of all the trial evidence, which encompassed those cited inconsistencies. Moreover, defendant's blanket denial that he "did not kill, command, or induce the murder of Anthony Hinton," Def.'s Aug. 22, 2019 Letter to Court at 1, offers no specific denial of the robust details presented at trial regarding the murder, including defendant picking up his gun the night of the murder, the statements attributed to him, his presence at the scene of Hinton's murder with a gun and shooting at Hinton along with Stancil, and rewarding Stancil the next day for the successful murder of Hinton, who was perceived as interfering with the drug business and testifying against fellow members of the drug organization. In any event, the current procedural posture of this case is not an opportunity to relitigate defendant's murder conviction, which was affirmed on direct appeal, nor does Section 404 of the First Step Act require such relitigation, notwithstanding defendant's persistent protestation of his innocence for the murder of Hinton. *See United States v. Abdul-Ali*, No. 19-60694, 2021 U.S. App. LEXIS 36565, at *4-5 (5th Cir. Dec. 10, 2021) (holding that "a 'modification proceeding' cannot serve as a vehicle for a 'collateral attack on a sentence long since imposed and affirmed on direct appeal.'" (quoting *United States v. Hernandez*, 645 F.3d 709, 712 (5th Cir. 2011)).

## II.      DISCUSSION

Defendant seeks a substantial sentence reduction under two separate sections of the First Step Act, with his request for a reduction under Section 404 of that statute addressed first, followed by his request for compassionate release under the First Step Act's amendment to 18 U.S.C. § 3582(c).

### A.      Section 404 Motion for Sentence Reduction

Defendant argues that he is eligible under Section 404 of the First Step Act for a reduced aggregate sentence and that a reduced sentence of 25 years' imprisonment—time served at the completion of the briefing of defendant's motion—is appropriate upon consideration of the factors in 18 U.S.C. § 3553(a).  Def.'s 404 Mot. at 22. [12]  The government contends that such a reduction is not permitted under Section 404, is unwarranted even if permitted, and should be "summarily den[ied]."  Gov't 404 Opp'n at 1.  Set out below is a review of the relevant provisions of the First Step Act and the parties' disputes over its application.

### 1.      Statutory Background and Parties' Dispute over Applicability to Defendant's Convictions

The Anti-Drug Abuse Act of 1986 provided three quantity-based penalty ranges for drug offenses under 21 U.S.C. § 841(a): ten years to life in prison, five to 40 years in prison, and up to 20 years in prison, Pub. L. No. 99-570, 100 Stat. 3207, with the quantities triggering different penalty levels varying based on the scheduled substance involved in the offense.  "For nearly 25 years, federal criminal law punished offenses involving crack cocaine far more harshly than offenses involving powder cocaine."  *United States v. Lawrence*, 1 F.4th 40, 42 (D.C. Cir. 2021).

---

[12]      Defendant also argues that a sentence of "no more than 40 years" is appropriate, *see id.*, and in reply that a sentence of 30 years is appropriate because the government allegedly offered him a binding plea agreement to 30 years of imprisonment, Def.'s 404 Reply at 23; Def.'s 404 Mot., Ex. J, Decl. of Thomas Abbenate, ECF No. 665-1. The analysis below applies generally to defendant's request for a reduction from his sentences of life imprisonment, regardless of the extent of the requested reduction.

In 2010, "[a]fter two decades of criticism, Congress reduced, but did not eliminate, the crack-to-powder disparity in the Fair Sentencing Act" by "'reduc[ing] the disparity between cocaine base and powder cocaine from 100-to-1 to 18-to-1,'" *id.* (quoting *White*, 984 F.3d at 81–82, other citations omitted).  Specifically, the Fair Sentencing Act raised the crack-cocaine threshold quantities for triggering certain penalty ranges for convictions, under § 841, but did not apply these changes retroactively to defendants who had already been sentenced for crack-cocaine offenses. [13]  This changed in 2018 with the enactment of the First Step Act.

The First Step Act was "intended to rectify disproportionate and racially disparate penalties" in federal sentencing for crack and powder cocaine offenses.  *United States v. Boulding*, 960 F.3d 774, 782 (6th Cir. 2020); *see also United States v. Birt*, 966 F.3d 257, 263 (3d Cir. 2020) ("The point of the First Step Act was to ameliorate certain penalties, including mandatory minimums, attached to drug dealing.").  To this end, section 404 of the First Step Act allows defendants to seek reduced sentences if they committed certain "covered offense[s]" prior to the enactment of the Fair Sentencing Act.  Section 404, titled "Application of Fair Sentencing Act," provides in full:

> (a) DEFINITION OF COVERED OFFENSE.—In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372), that was committed before August 3, 2010.

> (b) DEFENDANTS PREVIOUSLY SENTENCED.—A court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372) were in effect at the time the covered offense was committed.

---

[13]     Congress increased the cocaine base quantity triggering the 5-year minimum in 21 U.S.C. § 841(b)(1)(B) from five grams to 28 grams, and the quantity triggering the 10-year minimum in § 841(b)(1)(A) from 50 grams to 280 grams, and the quantity for the catch-all provision in 841(b)(1)(C) was thus increased from amounts under five grams to amounts under 28 grams.  *See* Fair Sentencing Act § 2.

(c) LIMITATIONS.—No court shall entertain a motion made under this section to reduce a sentence if the sentence was previously imposed or previously reduced in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372) or if a previous motion made under this section to reduce the sentence was, after the date of enactment of this Act, denied after a complete review of the motion on the merits.  Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section.

Eligibility for relief under Section 404 is limited to defendants previously sentenced for "a covered offense," as defined in Section 404(a), and not subject to the "limitations" in Section 404(c).  First Step Act §§ 404(a), (c).  For eligible defendants, Section 404(b) authorizes, but does not require, a court to exercise discretion to adjust the sentence by "impos[ing] a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act . . . were in effect at the time the covered offense was committed."  First Step Act § 404(b).  The D.C. Circuit has instructed that, in determining whether a sentence reduction is warranted for an eligible defendant, Section 404(b) requires a court to consider not only the 18 U.S.C. § 3553(a) factors, but also "new statutory minimum or maximum penalties; current Guidelines; post-sentencing conduct; and other relevant information about a defendant's history and conduct."  *Lawrence*, 1 F.4th at 44 (citing *White*, 984 F.3d at 92–93, and quoting *White*, 984 F.3d at 90).

The parties agree that some of defendant's offenses of conviction are "covered offense[s]" within the meaning of Section 404(a) and that defendant is not subject to the limitations of Section 404(c).  They disagree, however, whether (1) defendant's RICO conspiracy and CCE murder convictions, in Counts 3 and 6, respectively, are "covered offense[s]"; (2) the Court has discretion to resentence a defendant on non-covered offenses for which a defendant was sentenced along with covered offenses; and, (3) if so, whether this discretion should be exercised in this case to impose a reduced sentence.  Each issue is discussed in turn.

## 2.    *Agreed-Upon "Covered Offenses"*

Defendant argues that his convictions on each of the counts for which his sentence exceeds 20 years—Counts 2, 3, 6, and 38–41—are covered offenses under Section 404(a), subject to potential sentence reduction.  Def.'s 404 Mot. at 9–13.  To obtain the relief he requests, defendant's life sentences on five of these seven convictions—in Counts 2, 3, 6, 40, and 41—would have to be reduced.  The government agrees he is eligible for a sentence reduction as to Counts 2 (Super CCE) and 38 through 41 (crack cocaine distribution), but disputes that the other two convictions, on Count 3 (RICO conspiracy) and Count 6 (CCE murder), qualify as "covered offenses."  Gov't 404 Opp'n at 8; Gov't's Notice of Filing ("Gov't's 404 Notice") at 1, ECF No. 643.  The Court agrees with the government that Count 6 (CCE murder) is not a covered offense, but finds the other counts at issue are covered, as explained below.

### (a)    *Undisputed "Covered Offenses" in Counts 2, 38–41*

Count 2 (Super CCE) requires, for imposition of a mandatory life sentence, a finding that the defendant was involved in a "continuing criminal enterprise" involving "at least 300 times the quantity of a substance described in subsection 841(b)(1)(B)."  Def.'s 404 Mot. at 9; *see also* 21 U.S.C. § 848(b)(2)(A).  The Fair Sentencing Act changed the quantity of crack described in § 841(b)(1)(B) from five to 28 grams.  To apply the heightened mandatory life CCE penalty, then, a jury would have had to find that defendant was involved in a continuing criminal enterprise responsible for distributing 8.4 kilograms of crack cocaine, rather than the 1.5 kilograms the jury was instructed it had to find prior to the enactment of the First Step Act. Def.'s 404 Mot. at 9–10; Gov't's 404 Opp'n at 10.  Without this quantity finding, defendant still would have been guilty of engaging in a continuing criminal enterprise, as described in 21 U.S.C. § 848(c), but he would have been subject to a mandatory minimum of 20 years, not life,

under 21 U.S.C. § 848(a), which applies to felony narcotics trafficking offenses without otherwise referencing any quantity of drugs, *id.* § 848(c)(1).[14]

Eligibility for a reduced sentence under Section 404(a) of the First Step Act depends, categorically, on the statute of conviction rather than on the defendant's specific offense conduct or the actual effect of the Fair Sentencing Act on the defendant's Guidelines range given the specific offense conduct. *See Terry,* 141 S. Ct. at 1860, 1864 (holding, "[i]n light of the clear text, . . . that § 2(a) of the Fair Sentencing Act modified the statutory penalties only for subparagraph (A) and (B) crack offenses—that is, the offenses that triggered mandatory-minimum penalties" and therefore that "crack offenders who did *not* trigger a mandatory minimum" do not qualify to receive a reduced sentence (emphasis in original)); *White*, 984 F.3d at 86 (holding that "whether an offense is 'covered' does not depend on the actual drug amounts attributed to a defendant, whether by a judge or a jury. . . , [but rather] on whether the defendant was convicted of an offense with a statutory penalty range that the Fair Sentencing Act altered"); *United States v. Reed*, 7 F.4th 105, 112 (2d Cir. 2021) (noting that "the *Terry* Court also concluded … that eligibility should be determined by utilizing a categorical approach based upon the statutory penalties for the offense of conviction, rather than the nature of the offense conduct in a particular case.").

The Court agrees with the parties that Count 2 (Super CCE) is a "covered offense" because the penalty range to which a defendant is subject for violating 21 U.S.C. § 848(b), which expressly references 21 U.S.C. § 841(b)(1)(B), depends on drug quantity thresholds modified by

---

[14]    The government described its "revised position" on the scope of "covered offense[s]" as follows:  "[T]he government's revised position is that the term 'covered offense,' as defined in Section 404(a), refers to any pre-Fair Sentencing Act violation of 21 U.S.C. §§ 841(b)(1)(A)(iii), 841(b)(1)(B)(iii), 960(b)(1)(C), or 960(b)(2)(C).  The same is true of offenses whose statutory sentencing ranges are incorporated by reference from those modified provisions."  Gov't's 404 Notice at 1.

the Fair Sentencing Act.  Consequently, just as the Fair Sentencing Act changed the drug

quantity line dividing greater and lesser penalties for violating § 841, it also changed the line

dividing the lesser penalty under § 848(a) and the heightened, or "super," penalty under § 848(b).

Likewise, the government concedes that violations of 21 U.S.C. §§ 841(b)(1)(A)(iii) and

841(b)(1)(B)(iii) are, categorically, covered offenses.  Gov't's 404 Opp'n at 8.  Thus, counts 38

through 41, the crack distribution counts charging violations of these two statutory provisions,

are undisputed "covered offenses" because they are predicated on drug quantities changed by the

Fair Sentencing Act.

### (b)     Disputed Offense in Count 3: Defendant's RICO Conspiracy Conviction is a "Covered Offense"

The parties disagree whether Count 3 (RICO conspiracy) is a covered offense under the

Fair Sentencing Act.  Defendant argues that the RICO conspiracy conviction is a covered offense

due to its inextricable link to crack cocaine, noting that "the indictment allege[d] that the

enterprise affected interstate commerce through activities relating to the distribution of crack

cocaine."  Def.'s 404 Mot. at 12 (quoting Trial Tr. (July 30, 1996) at 67:22–24).  Defendant

further points out that the statutory penalties for this RICO conspiracy are tied to the underlying

predicate offenses, which included the crack offenses in Counts 38 and 39, under 21 U.S.C.

§§ 841(a)(1) and 841(b)(1)(B), and Counts 40 and 41, under 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(A), and a conspiracy to distribute crack cocaine, under 21 U.S.C. § 846.  Def.'s 404

Mot. at 11–12; *see also* Verdict Form 1, 4–5.  In defendant's view, a conspiracy charge is a

"covered offense" if *any* of the predicate acts underlying conspiracy are crack cocaine offenses

with sentencing ranges changed by the Fair Sentencing Act.  Def.'s 404 Mot. at 12; Def.'s 404

Reply at 6.  After all, defendant contends, the Sentencing Guidelines look to the offense levels of

the predicate offenses to determine the applicable base offense level for a RICO offense.  Def.'s

404 Mot. at 12 (citing U.S.S.G. § 2E1.1, app. note 1 ("Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of [determining the base offense level].")).  Defendant analogizes this to drug conspiracy counts, under 21 U.S.C. § 841, that contain, as objects of the conspiracy, both crack cocaine and other drug offenses.  Def.'s 404 Mot. at 12 (citing *United States v. Opher*, 404 F. Supp. 3d 853, 867 (D.N.J. 2019)); *see also Reed*, 7 F.4th at 110–11 (holding "that a sentence arising from a multi-object conspiracy conviction involving a crack cocaine object, with a statutory penalty provision under 21 U.S.C. § 841(b)(1)(A)(iii) or 21 U.S.C. § 841(b)(1)(B)(iii), is a 'covered offense' under Section 404 that is eligible for a sentencing reduction, even when the other objects of the conspiracy (involving different controlled substances) triggered statutory penalties that were not modified and thus the applicable minimum and maximum penalties for the conspiracy offense remain unchanged (citing same conclusion reached in *United States v. Spencer*, 998 F.3d 843 (8th Cir. 2021); *United States v. Winters*, 986 F.3d 942, 948 (5th Cir. 2021); *United States v. Taylor*, 982 F.3d 1295, 1301 (11th Cir. 2020); *United States v. Gravatt*, 953 F.3d 258 (4th Cir. 2020))).

The government counters that defendant's RICO conspiracy conviction is not a covered offense because the Fair Sentencing Act did not modify the penalties associated with the predicate statutes driving the maximum life sentence defendant faced on his RICO conviction. Gov't's 404 Opp'n at 11.  The statute provides for a statutory penalty of life imprisonment, as opposed to 20 years, when a violation is "based on a racketeering activity for which the maximum penalty includes life imprisonment."  18 U.S.C. § 1963(a).  Here, the jury found defendant guilty of committing two racketeering acts for which the maximum penalty includes life imprisonment: conspiracy to distribute over 1.5 kg of crack cocaine and first-degree murder.

Verdict Form at 1, 5; Trial Tr. (July 30, 1996) at 53:7–12.  Defendant would have been exposed
to life imprisonment regardless of the Fair Sentencing Act both because of the jury finding of his
guilt for the underlying murder predicate and because the jury-found drug quantity exceeded
even the post-Fair Sentencing Act quantity required for a maximum penalty of life
imprisonment.  *See* 21 U.S.C §§ 846, 841(b)(1)(A).  Thus, the government reasons that the Fair
Sentencing Act did not directly change the statutory penalties for RICO conspiracy under 18
U.S.C. § 1963(a), nor modify the statutory penalties faced by or applied to defendant such that
Count 3 does not qualify as a "covered offense."  Gov't's 404 Opp'n at 12.

Although the government's reasoning makes much sense, the categorical approach to
application of Section 404(a) makes irrelevant to the analysis of the threshold issue of whether
the RICO conspiracy is a "covered offense" what the actual effect on the penalty for this charge
is in this case.  As noted, the law is now clear that whether an offense is "covered" depends,
categorically and notwithstanding the actual sentencing effect, on whether the statutory penalty
range for the offense was altered by the Fair Sentencing Act.  *Terry,* 141 S. Ct. at 1864; *White*,
984 F.3d at 86.  The penalty provision for a RICO conspiracy offense provides that "[w]hoever
violates any provision of section 1962 of this chapter shall be . . . imprisoned not more than 20
years (or for life if the violation is based on a racketeering activity for which the maximum
penalty includes life imprisonment) . . . ."  18 U.S.C. § 1963(a).  Consequently, even though the
penalty provision in § 1963(a) was not directly amended by the Fair Sentencing Act,
examination of the predicate offense convictions is necessary to determine whether the "statutory
penalties" were "modified."  *See* First Step Act § 404(a).

Here, defendant was subject to a maximum penalty of life imprisonment on Count 3's
RICO conspiracy conviction because of the CCE murder predicate, but defendant was also

convicted of predicate crack offenses carrying mandatory minimum penalties, under 21 U.S.C. § 841(a)(1)(A) and (B), which categorically are "covered offenses." The D.C. Circuit has not addressed the issue of application of Section 404(a) to a conspiracy conviction with both covered and non-covered objects, but every other circuit to do so has held that a covered offense as an object of a multi-object conspiracy renders the entire conspiracy conviction a covered offense eligible for a sentence reduction under Section 404(b). *See Gravatt*, 953 F.3d at 263–64 (holding that defendant's conviction for conspiracy under §846 was a "covered offense," despite the fact that defendant's "dual-object conspiracy" involved both crack and powder cocaine, because the conspiracy statute "does not proscribe the possession or distribution of particular drugs by itself" but instead depended directly on the underlying drug offenses); *Reed*, 7 F.4th at 110–11 (collecting cases); *see also United States v. Williams*, No. 91-cr-559-6 (TFH), 2021 WL 5206206, at *8 (D.D.C. Nov. 9, 2021) (finding defendant "eligible for First Step Act relief and resentencing" on his conviction for multi-drug distribution conspiracy since "at least one of the drugs [in the conspiracy] was crack cocaine" and "[t]o find otherwise . . . would impose an additional limit on the Act's applicability that is not in the statute." (citing *Gravatt*, 953 F.3d at 264, other internal citations omitted)).

This uniform trend of appellate holdings is persuasive. Thus, the fact that defendant would have been subject to life imprisonment on the RICO conspiracy offense—regardless of any changes implemented by the Fair Sentencing Act and even absent the predicate crack offenses—because of the CCE murder conviction, has no bearing on the determination of whether the conspiracy offense is "covered" within the meaning of Section 404(a). As the Second Circuit explained in *Reed*, "eligibility should be determined by utilizing a categorical approach based upon the statutory penalties for the offense of conviction, rather than the nature

of the offense conduct in a particular case."  7 F.4th at 112 (discussing *Terry*, 141 S.Ct. at 1863–64).  When one object of a conspiracy triggers the "covered offense" definition of the First Step Act, "the statutory text in Section 404 does not require for eligibility any further inquiry regarding any other statutory penalties implicated on that count due to the other objects of the multi-object conspiracy offense."  *Id.* at 113.  *See also Terry*, 141 S. Ct. at 1860–64 (holding that defendant convicted of 21 U.S.C. §841(b)(1)(C) offense was not eligible for First Step Act sentence reduction because this was not a "covered" crack offense for which the Fair Sentencing Act modified the statutory penalties, and merely noting, without any further discussion as relevant to the inquiry, that defendant's sentence "was based on his recidivism, not his drug quantity," under the career-offender Guidelines, which "recommended a higher sentence than the drug-quantity Guidelines"); *Cf. United States v. Heatley*, No. 96-CR-515 (LAP), 2021 WL 2418431, at *2 (S.D.N.Y. June 14, 2021) (finding that defendant's RICO and Section 848 convictions did not involve crack cocaine predicates and therefore were not covered offenses under Section 404 of the First Step Act).

Thus, contrary to the government's position, defendant's conviction on Count 3 for RICO conspiracy is a covered offense.

> **(c)      *Disputed Offense in Count 6: Defendant's Conviction for CCE Murder is Not A "Covered Offense"***

The parties also disagree whether defendant's conviction on Count 6 (CCE murder), in violation of 21 U.S.C. § 848(e)(l)(A), is a covered offense under the Fair Sentencing Act. Defendant argues that his conviction on Count 6 for murder in furtherance of a continuing criminal enterprise, under 21 U.S.C. § 848(e), is a covered offense since this offense is predicated on violations of § 841(b), the penalties for which were modified by the Fair Sentencing Act, and because this CCE murder offense incorporates the drug quantities found in

§ 841(b).  *See* Def.'s 404 Mot. at 10–11.  The CCE murder statute provides a mandatory minimum term of 20 years' imprisonment and up to life imprisonment, or the death penalty, for any person "who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results," *either* (1) when "engaging in or working in furtherance of a continuing criminal enterprise, *or* . . . [(2)] engaging in an offense punishable under section 841(b)(1)(A) of this title . . . ."  21 U.S.C. § 848(e)(1)(A) (emphasis added).  A defendant "is engaged in a continuing criminal enterprise," under the first prong of § 848(e)(1)(A), only if the defendant "violate[d]" a provision of subchapter I or II of Chapter 13 of Title 21 of the Code, and "such violation is part of a continuing series of violations." 21 U.S.C. § 848(c)(1)–(2).  Under this first prong to establish a CCE murder offense, then, no reference is made to any penalty attached to the drug offense violation.  Defendant focuses on the second prong, contending that where "the continuing criminal enterprise consisted of a violation of § 841(b)(1) involving crack cocaine, the statutory penalties for § 848(e)(1)(A) were modified by section 2 of the [Fair Sentencing Act]."  Def.'s 404 Mot. at 10.  More broadly, defendant argues a violation of § 848(e)(1)(A) is a covered offense because it "incorporate[s] by reference" a provision that was modified by Section 404.  Def.'s 404 Mot. at 10–11.

The government counters with two arguments.  First, the government argues that the "statutory penalties" for CCE murder, under 21 U.S.C. § 848(e), were not modified by the Fair Sentencing Act and, thus, in the government's view, defendant's conviction on Count 6 is not a "covered offense" under the First Step Act.  Gov't 404 Opp'n at 13–14.  In explaining this position, the government highlights that CCE murder "sets forth an independent offense that is separate from any drug crime forming part of the underlying 'continuing series of violations.'" *Id*.  Under this view, CCE murder is never a "covered offense" under either predicate prong—

*i.e.,* regardless of whether it is predicated on engaging in a CCE (first prong) or committing drug trafficking conduct punishable under § 841(b)(1)(A) (second prong)—because the penalty range of the statute was not changed by Section 404 of the First Step Act.

For support, the government relies on a Sixth Circuit case concluding that CCE murder is not a "covered offense[]" because the First Step Act's Section 404(b) did not modify the penalties for this offense conduct under § 848(e)(1)(A).  Gov't's 404 Notice at 1 (citing *United States v. Snow*, 967 F.3d 563 (6th Cir. 2020) (per curiam)).  *Snow* held that the defendant's conviction, under § 848(e)(1)(A), of conspiring to kill a person while engaged in a conspiracy to distribute at least 50 grams of cocaine base, under § 841(b)(1)(A), did not constitute a covered offense.  967 F.3d at 564–65.  The court noted that the Fair Sentencing Act's Sections 2 and 3 did not modify the statutory penalty for a CCE murder but instead eliminated the offense for certain defendants, namely those defendants with an underlying § 841(b)(1)(A) violation with crack quantities above the pre-Fair Sentencing Act threshold but below the post-Fair Sentencing Act threshold.  *Id.* at 565.  This elimination of the entire offense with respect to certain individuals, the court reasoned, was not a "'modification' of 'statutory penalties'" within the meaning of Section 404(a) of the First Step Act, even though the defendant's § 848(e)(1)(A) conviction was predicated on a violation of § 841(b)(1)(A) and the First Step Act changed the crack cocaine quantity thresholds in that provision.  *Id.*

The Court need not weigh in on this construction of the statute, which would insulate a CCE murder conviction predicated on the *second* prong of § 848(e)(1)(A), for a violation of § 841(b)(1)(A), even when the First Step Act eliminated that element of the original offense. Here, unlike in *Snow*, defendant's § 848(e)(1)(A) conviction was predicated on the *first* prong of this statute, namely, for engaging in a CCE.  *See* Verdict Form at 5 (describing the offense as

"[i]ntentional murder of Anthony Hinton, while working in furtherance of a continuing criminal enterprise").  Thus, for this count of conviction, the fact of defendant's § 841(b)(1)(A) violation is not relevant.  As described above, § 848(e)(1)(A) provides a penalty for anyone who intentionally kills someone while "engaging in or working in furtherance of a continuing criminal enterprise, or [while] engaging in an offense punishable under section 841(b)(1)(A) . . . ," 21 U.S.C. § 848(e)(1)(A), with these two prongs providing two alternative elements for establishing a violation of the CCE murder statute.  Here, as the government's second argument asserts, since defendant was convicted of CCE murder using the CCE prong rather than the § 841(b)(1)(A) prong, the First Step Act had no effect on whether a violation of the drug laws could be used to establish part of a "continuing series of violations."  Gov't's 404 Opp'n at 14.  This second argument is persuasive.

Defendant focuses on the § 841(b)(1)(A) prong to argue that the CCE murder conviction is a covered offense because it is "tied to and incorporate[s] by reference" a statutory provision whose penalties were modified by the Fair Sentencing Act.  Def.'s 404 Mot. at 10–11.  Indeed, even if the penalty range of § 848(e)(1)(A) was not expressly altered, some people convicted under § 848(e)(1)(A) before enactment of the Fair Sentencing Act could not be found guilty of the offense today because of the changes to the quantity threshold in § 841(b)(1)(A).  Thus, defendant argues, "[t]he statute of conviction here, § 848(e), is a statute for which the triggering drug weights were modified by Section 2 of the Fair Sentencing Act."  Def.'s 404 Reply at 7.  Consistent with this reasoning, defendant relies primarily on a case addressing a conviction using the § 841(b)(1)(A) prong.  *Id.* (discussing *United States v. Davis*, No. 5:93-cr-30025-3 (JPJ), 2020 WL 1131147, at *2 (W.D. Va. Mar. 9, 2020)).  The district court in *Davis* held the defendant's § 848(e)(1)(A) murder conviction was a covered offense "because it relies on the

drug quantity thresholds set by § 841 and, therefore, requires a jury finding that the defendant committed a murder in furtherance of a drug conspiracy to sell 280 or more grams of cocaine base." 2020 WL 1131147, at *2 (citing *United States v. Guerrero*, 52 F. Supp. 3d 643, 648–49 (S.D.N.Y. 2014)). In *Davis*, the defendant was convicted of "conspiring to distribute cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii)," and the CCE murder conviction relied on this fact. *Id.* at *1. The defendant was not even charged with participating in a continuing criminal enterprise. *Id.* His CCE murder conviction therefore relied entirely on the § 841(b)(1)(A) charge and implicated the crack cocaine quantity limits that were changed by the Fair Sentencing Act. For this same reason, *Davis* is distinguishable from the instant case.[15]

Defendant's reasoning would be compelling for a § 848(e)(1)(A) conviction predicated on a § 841(b)(1)(A) violation, but is irrelevant here, where defendant's CCE murder conviction was based on the CCE prong. The record makes clear that defendant's CCE murder conviction was predicated on his participation in a CCE, and defendant does not argue otherwise. *See* Verdict Form at 5 (describing the offense as "[i]ntentional murder of Anthony Hinton, while

---

[15]    Defendant also relies on two circuit decisions for the more general proposition that criminal statutes incorporating subsections of § 841 directly modified by the Fair Sentencing Act are "modified" within the meaning of First Step Act. Def.'s 404 Reply at 7 (discussing *United States v. Smith*, 954 F.3d 446, 449 (1st Cir. 2020) and *United States v. Woodson*, 962 F.3d 812, 815 (4th Cir. 2020)). The government's notice of its "revised position," stating that a covered offense encompasses "offenses whose statutory sentencing ranges are incorporated by reference from those modified provisions," Gov't's 404 Notice at 1, seems in agreement with this general proposition. Nonetheless, *Smith* and *Woodson* are not helpful to defendant's position. In both cases, the First and Fourth Circuits held that convictions under § 841(a) applying the penalty from § 841(b)(1)(C)—which previously applied to violations involving less than five grams of crack cocaine but, after passage of the Fair Sentencing Act, applied to violations involving less than 28 grams of crack cocaine—were covered offenses. 954 F.3d at 451; 962 F.3d at 817. In so holding, each court recognized that § 841(b)(1)(C) had not itself been amended because it was, in effect, a catch-all provision to cover crack cocaine quantities below those designated in the amended subsections of § 841(b)(1)(A) and (B). *See Smith*, 954 F.3d at 450 ("Since § 841(b)(1)(C) is defined in part by what § 841(b)(1)(A) and § 841(b)(1)(B) do not cover, a modification to the latter subsections also modifies the former by incorporation."). The First Circuit reasoned that the combined impact of a mandatory guideline regime and the setting of sentencing ranges under this regime in a manner reflecting the then-applicable crack-powder sentencing disparity, warranted remedial action under the First Step Act. *Id.* at 451. Putting aside the fact that the holdings in both *Woodson* and *Smith* regarding application of the First Step Act to violations of § 841(b)(1)(C), has since been rejected by the Supreme Court in *Terry*, which held that an offense subject to § 841(b)(1)(C) was not a "covered offense," 141 S. Ct. at 1864, these two cases simply do not address the CCE prong of 21 U.S.C. § 848(e)(1).

working in furtherance of a continuing criminal enterprise"); Retyped Superseding Indictment at 34 (describing the offense as intentional killing "while engaging in and working in furtherance of a Continuing Criminal Enterprise"); Trial Tr. (July 30, 1996) at 86:6–10 (instructing the jury that "the government must prove beyond a reasonable doubt that the decedent was intentionally killed while the defendants were engaged in or working in furtherance of a continuing criminal enterprise").  Even if defendant's drug crimes formed part of the continuing series of violations needed to establish the CCE murder offense, the quantity of drugs and the severity of the penalties was irrelevant.  Viewed this way, the Fair Sentencing Act's change in penalties for crack offenses did not change whether a crack cocaine offense could form part of a "continuing series of violations."  Illegal crack distribution *in any quantity* was a qualifying felony supporting the existence of a CCE offense as an element both before and after enactment of the Fair Sentencing Act.  Gov't's 404 Opp'n at 14; *see also United States v. Roane*, No. 3:92-cr-68 (DJN), 2020 WL 6370984, at *11 (E.D. Va. Oct. 29, 2020) ("Defendant received the challenged sentences for murdering individuals in furtherance of a continuing criminal enterprise, not for violating the federal narcotics laws.  Thus, the statutes modified by the Fair Sentencing Act did not form the predicates for [d]efendant's convictions under § 848(e)(1)(A)."); *United States v. Fletcher*, 997 F.3d 95, 97 (2d Cir. 2021) ("Because Sections 2 and 3 of the Fair Sentencing Act did not modify the statutory penalties for Section 848(e)(1)(A), a violation of that law is not a "covered offense" eligible for a sentence reduction under Section 404(b) of the First Step Act.")

For these reasons, the Court agrees with the government that Count 6 (CCE murder) is not a covered offense.

### 3.  No Authority Under Section 404(b) to Modify Defendant's Sentences for Non-Covered Offenses

The parties further disagree about the scope of judicial authority under Section 404(b) of the First Step Act to modify a defendant's sentences for non-covered offenses when a defendant has been convicted of a "covered offense" within the meaning of Section 404(a).  Defendant argues that the "sentencing package doctrine" supports a new sentence on all counts in this case, reasoning that, even if the government were correct that Count 6 (CCE murder) is not a covered offenses, this count was addressed together, or grouped, with covered offenses in Count 2 (Super CCE), Count 3 (RICO conspiracy) and Counts 38–41 (drug trafficking), *see supra* Part I.B., so a reduced sentence on the entire sentencing package should be available.  Def.'s 404 Mot. at 33–37.  As explained below, the narrow circumstances in which the D.C. Circuit has applied the sentencing package doctrine do not support such application in the instant case to defendant's non-covered offense in Count 6.

Under the sentencing package doctrine, "at least in some instances, sentences on multiple counts may comprise a 'sentencing package,' so that attacking the sentence on some counts . . . reopens the sentence on the other counts as well."  *United States v. Townsend*, 178 F.3d 558, 567 (D.C. Cir. 1999).  This doctrine has developed in recognition of the fact that "when a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an overall plan, and that if some counts are vacated, the judge should be free to review the efficacy of what remains in light of the original plan."  *Id*. (internal quotation marks and citations omitted).  Counts that "are inherently interdependent" generate sentences "particularly well suited to be treated as a package."  *Id*. at 567–68.  *See also United States v. Smith*, 467 F.3d 785, 789 (D.C. Cir. 2006) ("[The doctrine] rests on the interdependence of the different segments of the sentence, such that

removal of the sentence on one count draws into question the correctness of the initial aggregate minus the severed element."); *United States v. Ausby*, No. 72-cr-67 (BAH), 2019 WL 2870232, at *5–6 (D.D.C. July 3, 2019) ("[T]he broader principle underlying the 'sentencing package' doctrine [is] that affording relief on a challenged count requires revisiting other counts due to their interdependence . . . .").

Defendant argues that the relief contemplated by Section 404(b) is not limited to covered offenses so long as the defendant has been charged with at least one covered offense within the relevant sentencing package.  Def.'s 404 Mot. at 17–18; Def.'s 404 Reply at 2–4.  Reconsidering the aggregate sentence upon a finding that a defendant was sentenced for a covered offense reflects, in defendant's view, "the holistic approach that a district court should employ when sentencing a defendant convicted of multiple offenses."  Def.'s 404 Mot. at 34 (quoting *United States v. Ventura*, 864 F.3d 301, 309 (4th Cir. 2017)).  As support, defendant observes that federal statutes and the United States Sentencing Guidelines consider counts of conviction and the accompanying terms of imprisonment together, to argue that a court considering a sentence reduction under Section 404(b) of the First Step Act should do the same with related counts. Def.'s 404 Reply at 2–3 (citing 18 U.S.C. § 3584(c); U.S.S.G. Ch.3, Pt. D, intro. comment); *see also Dean v. United States*, 137 S. Ct. 1170, 1175–76 (2017) (concluding that "[a]s a general matter, the foregoing provisions [§§ 3553(a), 3582, and 3584(b)] permit a court imposing a sentence on one count of conviction to consider sentences imposed on other counts").

Put another way, defendant suggests that the sentencing package doctrine effectively authorizes a full resentencing on all counts if any constituent count making up the aggregate sentence is a "covered offense" under Section 404(a) of the First Step Act, based on the assumption that sentences imposed at the same time are sufficiently "interdependent" to qualify

for invocation of this doctrine. This position is contrary to the D.C. Circuit's express direction that "not every judgment involving multiple convictions presents a sentencing package in which vacating the sentence on one count unravels the remaining sentences." *United States v. Palmer*, 854 F.3d 39, 49 (D.C. Cir. 2017).

The government is critical of the defendant's position as overreaching, though the government acknowledges that in some cases a sentence reduction should be available for a non-covered offense, but only if the non-covered offense was originally grouped with the covered offense and the statutory penalties on the covered offense directly affect the guideline calculation on the non-covered offense. Gov't's 404 Opp'n at 16 n.8 (citing *United States v. White*, 413 F. Supp. 3d 15, 48 (D.D.C. 2019), *rev'd* 984 F.3d 76 (D.C. Cir. 2020)). Outside this narrow category of cases, the government argues that courts lack authority under Section 404(b) of the First Step Act to reduce non-covered sentences. Pointing out that 18 U.S.C. § 3582(c)(1)(B) provides the vehicle for sentence reduction under the First Step Act, and that Section 404(b) does not "expressly permit" modification of sentences pertaining to non-covered offenses, the government concludes that a reduced sentence is unavailable on the non-covered offense at issue in this case. Gov't's 404 Opp'n at 15–16. The government further relies on the language in Section 404(b) providing that a sentence may be reduced "as if sections 2 and 3 of the [Fair Sentencing Act] were in effect at the time the covered offense was committed" as limiting the degree to which a court may reduce a defendant's sentence on a non-covered offense. *Id.*

The D.C. Circuit has not addressed the issue of whether Section 404(b) authorizes a court to reduce aggregate sentences imposed on both non-covered and covered offenses, whether under the sentencing package doctrine or the terms of the First Step Act itself. The Second, Fifth, and Eleventh Circuits have expressly held that the First Step Act does not grant the broad

authority defendant seeks to have exercised here.  *See United States v. Young*, 998 F.3d 43, 49,

55 (2d Cir. 2021) (holding that First Step Act did not authorize sentence reduction because

defendant's "eligibility for resentencing on Count One under the First Step Act does not alter his

ineligibility for resentencing on Count Two" and "a court may not resentence a defendant on any

count of conviction without direct statutory authorization to do so" as "[s]entences are imposed

for specific convictions within judgments of conviction" (internal citations omitted)); *Martin*,

974 F.3d at 137 (noting that "[t]he language of the First Step Act is circumscribed, it permits

courts only to '*impose a reduced sentence* as if sections 2 and 3 of the Fair Sentencing Act . . .

were in effect at the time the covered offense was committed,'" and holding that "[t]he plain

language of the Act permits the limited modification of a specific sentence, it does not give

district courts *carte blanche* to modify terms of imprisonment other than those imposed for

'covered offenses.'" (quoting, with emphasis added, § 404(b)); *United States v. Hegwood*, 934

F.3d 414, 418 (5th Cir. 2019) (holding that the First Step Act did not permit a court to alter

defendant's sentences for non-covered offenses because the "express back-dating only of

Sections 2 and 3 of the Fair Sentencing Act of 2010—saying the new sentencing will be

conducted 'as if' those two sections were in effect 'at the time the covered offense was

committed'—supports that Congress did not intend that other changes were to be made as if they

too were in effect at the time of the offense" and "[i]n statutory construction, the expression of

one thing generally excludes another" (internal citations omitted)); *United States v. Gee*, 843 F.

App'x 215, 217 (11th Cir. 2021) ("The court 'is not free to change the defendant's original

guidelines calculations that are unaffected by sections 2 and 3,' nor is it free 'to change the

defendant's sentences on counts that are not 'covered offenses'" (quoting *United States v.

Denson*, 963 F.3d. 1080, 1089 (11th Cir. 2020), and finding that defendant's "§ 924(c)

convictions are not 'covered offenses' under § 404(b), so that section does not allow him to be resentenced on them."); *United States v. McCurry*, 833 F. App'x 284, 286–87 (11th Cir. 2020) (reiterating holding in *Denson*, that, pursuant to the First Step Act, a district court may reduce a defendant's sentence "only on a 'covered offense'" and is 'not free to change the defendant's original guidelines calculations that are unaffected by sections 2 and 3' of the Fair Sentencing Act, which the First Step Act made retroactive" (citing *Denson*, 963 F.3d at 1089)).[16]

Diverging from this recent line of authority, defendant relies on *United States v. Hudson*, 967 F.3d 605 (7th Cir. 2020), as support for his view that, so long as a covered offense was part of the aggregate sentence, the First Step Act permits a sentence reduction on any non-covered offense. Def.'s 404 Reply at 9. The Seventh Circuit, in *Hudson,* concluded that Section 404(b) "does not bar a court from reducing a non-covered offense" because "[e]xcluding non-covered offenses from the ambit of First Step Act consideration would, in effect, impose an extra-textual limitation on the Act's applicability." 967 F.3d at 610. While the Supreme Court's decision in *Terry* did not address the permissibility under the First Step Act of reductions in aggregate sentences for combined non-covered and covered offenses, the Court's guidance runs counter to the broad sentence reduction authority invited by this reading of *Hudson*. Instead, *Terry* hewed closely to the statutory text and denied eligibility to a defendant convicted under 21 U.S.C. § 841(b)(1)(C) because the "statutory penalties" were "exactly the same," both before and after

---

[16]     *See also United States v. Smith*, No. 04-cr-80857 (SFC), 2020 WL 3790370, at *10 (E.D. Mich. July 7, 2020) ("At the very least, Sec. 404(b) does not *expressly permit* the Court to reduce a sentence for a non-covered offense. *See* 18 U.S.C. § 3582(c)(1)(B). [Assuming] that a court could reduce a sentence for a covered offense because Sec. 404(b) did not *expressly prohibit* such a reduction . . . overlooks the longstanding, well-defined limits placed on the power of a district court to modify an imposed sentence." (emphasis in original)); *United States v. Coleman*, 382 F. Supp. 3d 851, 859 (E.D. Wis. 2019) ("The First Step Act does not 'expressly permit' the court to conduct a plenary resentencing. It does not authorize the court to disturb the 120-month sentence [imposed on the non-covered offense in Count One]. . . . It authorizes the court to do one thing—recalculate the sentence on [the covered offense in] Count Two as if section 2(a) of the [Fair Sentencing Act] had been in effect when he committed that crime.").

enactment of the Fair Sentencing Act, 141 S. Ct. at 1862–63, observing that it "defies common parlance to say that altering a *different* provision modified subparagraph (C)," *id.* at 1864 (emphasis in original).  Rather than asking whether the First Step Act presented any bar to a court's action on a non-covered offense, as the *Hudson* reasoning suggests, *Terry* focused on whether the amendments affected by the Fair Sentencing Act altered the statutory penalty for the offense of conviction, an approach that cautions against construing Section 404(b) to apply broadly to non-covered offenses simply due to inclusion of a covered offense in an aggregate sentence. [17]  Even so, this conclusion does not answer the question whether the long-standing sentencing package doctrine authorizes reopening sentences imposed on non-covered offenses when Section 404 may not, by its terms, so permit.

Assuming *arguendo* that the sentencing package doctrine permits resentencing under the First Step Act on non-covered offenses "at least in some instances," *Townsend*, 178 F.3d at 567, leads to the key question here whether the life sentence imposed on defendant's non-covered offense in Count 6 (CCE murder) is so interdependent with the sentences imposed on his covered offenses that they should be treated as a package.  Such interdependence may be gleaned, for example, when sentences imposed on some counts are modified, either increasing or decreasing in severity, to account for a consecutive mandatory sentence in the aggregate sentence.  *See, e.g.*, *United States v. Lassiter*, 1 F.4th 25, 26, 31 (D.C. Cir. 2021) (affirming, on resentencing, increased sentence from 240 to 300 months on defendant's kidnapping conviction, after vacatur of his 18 U.S.C. § 924(c) conviction, and finding the fact defendant had originally been granted a

---

[17]    In any event, *Hudson* may be read more narrowly to permit sentence reductions on non-covered offenses that have been grouped with, and driven the guideline range for, covered offenses at sentencing.  *See United States v. Rollins*, No. 06-cr-40063-JPG-004, 2021 WL 3891730, at *2 (S.D. Ill. Aug. 31, 2021) ("Where another non-covered offense is part of an aggregate sentencing package dependent on a covered offense, the Court may reduce that component of the package as well." (citing *Hudson*, 967 F.3d at 612)).

"33% discount on [his] kidnapping count, a variance especially striking given [his] concededly egregious criminal conduct" to be a strong indicator that the judge had "originally intended a sentencing package" (internal citations and quotation marks omitted)); *Townsend*, 178 F.3d at 569 (observing that "[t]he amount of downward departure allowed by a sentencing judge is inevitably affected by the total sentence imposed, and the departure allowed on a given count will naturally depend on the departure allowed on other counts," and affirming reopening of entire sentence as a sentencing package, resulting in re-imposition of original sentence, despite vacatur of § 924(c) counts, since "the departure actually imposed on the non-924(c) counts was chosen in light of the term imposed on the § 924(c) counts").  Conversely, the lack of interdependence may also be demonstrated by imposition of separate sentences, without any indicia by the sentencing judge that the aggregate sentence was intended to accommodate any one of those sentences.  *See Smith*, 467 F.3d at 790 (concluding that defendant was not entitled to resentencing on his grouped counts in the wake of vacatur of his 18 U.S.C. § 924(c) conviction, because the sentences on the grouped counts and the § 924(c) violation "were in no way interdependent" and the sentencing court "exercising its discretion, [had] sentenced Smith to several concurrent life terms," declining to depart from the "highest sentence available" under statute, before imposing the vacated consecutive 30-year term under § 924(c)).

The D.C. Circuit has also recognized that "mutual exclusivity is an exceptionally strong form of interdependence," permitting resentencing on otherwise unaltered counts as part of a sentencing package.  *Smith*, 467 F.3d at 789; *see also United States v. Morris*, 116 F.3d 501, 504–05 (D.C. Cir. 1997) (affirming trial court's authority to impose Guidelines enhancement provision for possession of a firearm, under U.S.S.G. § 2D1.1(b)(1), after vacatur of defendants' § 924(c) convictions, thereby increasing their sentences, because these penalties are

"interdependent and . . . mutually exclusive," and therefore amending their sentences to include the enhancement was "compelled by the complete interdependence and mutual exclusivity of the two provisions").

Finally, interdependence may be evident based on the statements of the judge at sentencing. In *Townsend*, the panel pointed to the sentencing court's statements, "in response to the government's motion for reduction of sentence, . . . that he intended to grant the motion, but needed to 'work out the formula' to accomplish the overall term of imprisonment desired" and that "'there were nine counts, and they all have to be coordinated,'" as evidence that defendant's sentence was comprised of highly interdependent component parts. 178 F.3d at 568–69. Similarly, in *Lassiter,* the court found that the sentencing judge had treated the convictions as interdependent by "emphasiz[ing] the need to craft a singular 'sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to deter future criminal conduct,'" and "acknowledg[ing] that he could not approach the kidnapping sentence in a vacuum, describing the guidelines recommendation as 'only one factor' for a just sentence," 1 F.4th at 31 (internal alterations and citations omitted), despite never explicitly using the phrase "sentencing package," *id.* at 30. These statements, the *Lassiter* court found, supported finding that the sentencing judge had intended a sentencing package. *Id.* at 31. [18] *See also Palmer*, 854

---

[18]     The out-of-circuit decisions on which defendant relies generally fit within the D.C. Circuit's framework for requiring interdependence for the sentencing package doctrine to apply and, as such, do not support his position that the presence of a covered offense should trigger resentencing on non-covered offenses. *See* Def.'s 404 Mot. at 34–36 (citing *United States v. Ventura*, 864 F.3d 301 (4th Cir. 2017), and *United States v. Fowler*, 749 F.3d 1010 (11th Cir. 2014)). In *Ventura*, the Fourth Circuit rejected defendant's challenge when his aggregate sentence for various sex trafficking convictions remained the same after vacatur of his sentence for violating 18 U.S.C. § 924(c), finding that "[p]ursuant to the sentencing package doctrine," vacatur of the § 924 conviction "left ample room for the district court to recalculate the sentences related to [defendant's] other six convictions," 864 F.3d at 309. Similarly, in *Fowler*, the Eleventh Circuit highlighted the statements of the sentencing judge as strong evidence of an intent to impose a package sentence: "The district court judge also explained that, regardless of any retrial, he was going to vacate the sentence on Count 2 and resentence Fowler on that count 'because obviously a ten-year sentence on Count 2 is interrelated with the life sentence I gave on Count 1. I would not have given someone ten years on a murder-with-a-firearm charge standing alone.'" 749 F.3d at 1014.

F.3d at 49 (finding "that resentencing is unnecessary where . . . the district court merely vacated convictions for lesser included offenses subject to merger," particularly where the record provided "no basis to conclude that the district court presiding at [a defendant's] criminal trial imposed a harsher sentence on the greater offense than it would have in the absence of the lesser offense").

Set against this guidance on the contours of the sentencing packaging doctrine, the Court concludes that defendant's sentence on the non-covered offense in Count 6 (CCE murder), has no "mutual exclusivity" nor any interdependence with any sentences imposed on the covered offenses in Count 2 (Super CCE), Count 3 (RICO conspiracy), and Counts 38–41 (drug trafficking), that warrants application of the sentencing package doctrine. Consequently, this defendant's sentence on the non-covered Count 6 (CCE murder) retains its finality and may not be reduced.

First, nothing in the record of the sentencing hearing suggests that the life sentence imposed on Count 6 was fashioned to account for the presence of any of other count of conviction in the aggregate sentence. By its terms, defendant's CCE murder conviction stands on its own and does not rely either for its continued viability or its associated penalty on a predicate offense for which the sentence is subject to reduction under Section 404. In other words, any modification of the sentences on the covered offenses in Counts 2, 3, and 38–41, does not "draw[] into question the correctness of the initial aggregate minus the severed element[s]." *Smith*, 467 F.3d at 789. Defendant received five concurrent life sentences, on Counts 2, 3, 6, 40, and 41. Min. Entry (Nov. 18, 1996); Sent'g Hr'g Tr. at 73:2–18. Reducing three or four of defendant's life sentences on covered offenses to terms of years would not change the "initial aggregate" sentence of life, nor "draw[] into question the correctness" of the life sentence on the

non-covered offense, *Smith*, 467 F.3d at 789, which instead represents "the punishment for [that] single count." *Morris*, 116 F.3d at 504.  The covered-offense charges need not have been brought to trial, nor resulted in conviction, for defendant to have been found guilty of murder in furtherance of a continuing criminal enterprise.  Five concurrent life sentences on separate counts do not amount to an "overall plan." *Townsend*, 178 F.3d at 567.

Furthermore, close review of the sentencing hearing in this case, with a focus on the plain language of the sentencing judge's remarks, reflects no indication that imposition of the life sentence on Count 6 was interdependent with the defendant's sentences on Counts 2, 3, or 38–41.  *See* Sent'g Hr'g Tr. at 73:2–9 (Sentencing judge stating: "On Count 2, I'm imposing a sentence of life imprisonment.  Count 3, life imprisonment.  Count 4, two years to life, the mandatory minimum of 20 years.  Count 6, life.  Count 29, 5 to 15 years.  Count 38 and 39, 40 years.  Counts 40 and 41, life sentence. . . . *[A]ll those sentences are going to run concurrently*." (emphasis added)).  *See also Ausby*, 2019 WL 2870232, at *6 (finding no interdependence where the sentencing judge instructed defendant, "On the first count in which you were found guilty, felony murder, the Court will sentence you for a period of life imprisonment.  On the second count, carnal knowledge while armed, the Court will sentence you for a period of ten to thirty years.").  Rather, the judge imposed on defendant a life sentence for Count 2 (Super CCE) and, once that was complete, further imposed concurrent terms of life for Counts 3, 6, 40, and 41. The language employed at sentencing in no way suggested the sentences were interdependent. *See Smith*, 467 F.3d at 790.

Defendant argues that a court considering sentence reductions under Section 404(b) should look to the grouping of the counts of conviction under the Sentencing Guidelines and consider all grouped counts to be part of a sentencing package, regardless of whether each count

qualifies as a "covered offense."  Def.'s 404 Reply at 5.  This approach has the benefit of simplicity but is too superficial to comply with the D.C. Circuit's more rigorous interdependence test.  As the Second Circuit correctly explained in *Young*, the mere grouping under the Sentencing Guidelines of covered and non-covered offenses does not extend the authority of a court under the First Step Act to reduce the sentence on non-covered convictions:

> Sentences are imposed for specific convictions within judgments of conviction.  Judgments of conviction are final judgments that are only modifiable by courts in limited circumstances, including where 'expressly authorized' by statute.  The fact that multiple sentences may be aggregated for administrative purposes does not authorize a court to treat those sentences as an undivided whole, the authorization to modify one part of which confers authorization to modify the whole.

998 F.3d at 55 (internal citation omitted); *see also Martin*, 974 F.3d at 136 ("Aggregation for administrative purposes does not imply that every sentence imposed may be modified based on an authorization to modify one component part.").

The Court is persuaded by the reasoning in *Young* and *Martin*.  While defendant's non-covered conviction in Count 6 was grouped in the PSR "for administrative purposes," *id.*, with his covered-offense conviction in Count 3 (RICO conspiracy), PSR ¶ 208, to calculate the aggregate time he would serve, this organizing structure is irrelevant for purposes of the First Step Act.  The grouping of Counts 3 and 6 does not negate the fundamental independence of defendant's five concurrent life sentences "imposed for specific convictions within [the] judgment[] of conviction," *Young*, 998 F.3d at 55, as demonstrated by the imposition of each sentence on each count separately by the sentencing judge.  Sent'g Hr'g Tr. at 73:2–9.

The D.C. Circuit's opinion in *White* does not dictate a different conclusion.  While the *White* panel stressed that "[t]he First Step Act 'make[s] possible the fashion[ing] [of] the most complete relief possible,'" 984 F.3d at 90 (quoting, with alterations, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)), and instructed district courts, when determining whether a

defendant merits relief, to "consider 'all relevant factors,'" *Lawrence*, 1 F.4th at 43 (quoting *White*, 984 F.3d at 93), employing discretion that is "'broad,' but not 'unfettered,'" *Lawrence*, 1 F.4th at 43 (quoting *White*, 984 F.3d at 88), the availability of relief still "depends only on whether the defendant was convicted of an offense with a statutory penalty range that the Fair Sentencing Act altered," *White*, 984 F.3d at 86.  As applied here, "if sections 2 and 3 of the Fair Sentencing Act were in effect at the time" that defendant committed the conduct underlying Count 6, the life sentence defendant currently faces would not change, as the Fair Sentencing Act did not modify the penalties driving this sentence nor introduce any "revised penalty range[s ] applicable to the drug amount in the original statute[s] of conviction." *Id*.  The broad authority granted by *White* to reduce sentences for covered offenses under the First Step Act context is not so broad to authorize reductions of wholly independent sentences for non-covered offenses that fall outside the coverage of that statute.

To adopt an interpretation of the First Step Act reaching defendant's non-covered conviction would have widespread ramifications beyond the scope of what Congress intended. At a minimum, this broader reading of the First Step Act would mean that, under section 404(a), the finding of a single "covered offense" would make unnecessary any analysis of whether other convictions were "covered" or otherwise interdependent to determine eligibility for a sentence reduction, allowing a court to reach both covered and non-covered convictions when determining "when a motion for reduced sentence *should* be granted." *White*, 984 F.3d at 88 (emphasis in original).  In assessing whether such a sentence reduction would be warranted, current advisory guidelines would be considered, effectively making the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), retroactive for defendants with any covered offense, while not for other similarly situated convicted defendants.  *See In re Fashina*, 486 F.3d 1300, 1301

(D.C. Cir. 2007) ("We hold *Booker* does not apply retroactively."); *In re Zambrano*, 433 F.3d 886, 888 (D.C. Cir. 2006) (noting that the "Supreme Court has never expressly held *Booker* retroactive.  *Booker* itself did not state that its rule was retroactive to cases on collateral review. Nor has the Court held *Booker* retroactive in any subsequent case." (citation omitted)).  Such an expansive interpretation of district courts' authority under Section 404(b) to reduce sentences— divorced from the textual limitations in the First Step Act or the circumscribed limits of the sentencing package doctrine—would create a substantial risk of sentencing disparities and effectively turn each district court judge into an individual parole board for defendants convicted of crack cocaine offenses, regardless of the other convictions those defendants simultaneously incurred, without offering defendants convicted *only* of non-covered offenses the same opportunity for broad reconsideration of their sentences based on consideration of 18 U.S.C. § 3553(a) factors, including post-sentencing conduct and rehabilitation.

Notwithstanding the "strong remedial" purposes of the First Step Act, *White*, 984 F.3d at 90, and the wholistic nature of sentencing, *see Dean*, 137 S. Ct. at 1175–76, the mere fact that defendant is serving a sentence for some covered offenses does not, standing alone, authorize reduction of his life sentence on Count 6, which is not a covered offense.  Nor does the sentencing package doctrine provide an extra-statutory basis for unraveling his sentence on this non-covered offense.  Consequently, defendant is "not entitled to relief" as to his non-covered offense for which he is currently serving a life sentence, "and thus First Step Act relief is not warranted in his case."  *United States v. Mendiola*, No. 3:08-cr-119 (JKS), 2020 WL 569875, at *4 (D. Alaska Feb. 5, 2020).

As to defendant's covered offenses, the government recommends that the Court decline to exercise its discretion to consider sentence reductions "[b]ecause reducing the defendant's

sentence for his covered offenses will not impact his ultimate sentence of life imprisonment." Gov't's 404 Opp'n at 16. [19]  The Court agrees.  No favorable decision for defendant on the covered offenses would actually reduce his term of imprisonment, which is simply not redressable under Section 404 of the First Step Act due to the life term he is serving on non-covered Count 6.

Performing the exercise of determining what sentence reductions, if any, would be appropriate for each covered offense, after consideration of the 18 U.S.C. § 3553(a) factors, would essentially amount to issuance of an advisory opinion and would be futile in actually reducing defendant's sentence.  Accordingly, no further discussion or review of the defendant's covered offenses is necessary.  *See United States v. Parker,* 993 F.3d 595, 606 (8th Cir. 2021) (declining to review concurrent life sentence on count 2 because the conviction and life sentence on count 1 was valid and a ruling in defendant's favor on count 2 would not reduce the time served on count 1); *United States v. Stuckey*, No. 20-1565, 2021 WL 2470308, at *2 (6th Cir. Feb. 8, 2021) (affirming denial of defendant's First Step Act motion for sentence reduction because "[r]egardless of his sentence for the drug-conspiracy conviction, [defendant]'s conviction for murder to prevent a person from providing information concerning a federal crime to federal authorities, in violation of 18 U.S.C. § 1512(a)(1)(C), required a sentence of life imprisonment" and thus "[d]eclining to review [defendant]'s sentence for his drug-conspiracy

---

[19]     Defendant is serving life sentences on the covered offenses in Counts 2 (Super CCE), 3 (RICO conspiracy), 40, and 41, and 40 years' imprisonment on the covered offenses in Counts 38 and 39.  Under current statutory penalties, his sentences on Counts 38 and 39 (crack distribution) would change to a maximum of 20 years' imprisonment, based on the amounts of 13.64 grams and 12.42 grams, respectively, alleged in the indictment for these convictions, and his sentences on Counts 40 and 41 (crack distribution) would change to five to forty years' imprisonment, based on the alleged amounts of 53.06 grams and 55.74 grams, respectively.  The statutory penalties for Counts 2 and 3 would remain unchanged under current law.  Although eligible for sentence reductions on these covered offenses, defendant concedes that his Guidelines sentencing range on these counts grouped together, with the original specific offense characteristics applied, would remain life imprisonment, even using only jury-found quantities.  Def.'s 404 Mot. at 16.

conviction is unlikely to subject him to any adverse collateral consequences because he must

serve a life sentence for his murder conviction."); *Heatley*, 2021 WL 2418431, at \*2 (finding that

defendant's RICO and Section 848 convictions did not involve crack cocaine and were not

covered offenses under Section 404 of the First Step Act and therefore denying sentence

reduction, explaining that "even if [defendant] had been convicted of a covered offense, his

sentence would not be practically impacted; Defendant would still face a mandatory life sentence

because of his additional conviction for the murders in aid of racketeering"); *United States v.*

*Jefferson*, No. 97-cr-276 (2) (MJD), 2021 WL 2143478, at \*3–4 (D. Minn. May 26, 2021)

(declining "to review Defendant's challenge [under Section 404 of the First Step Act]  to his

sentence on the CCE count," since even if his sentence were reduced on the CCE count "it would

not reduce his life sentence on the murder counts").

Defendant's motion for a sentence reduction is therefore denied.

### B.      Motion for Compassionate Release

Defendant also moves for compassionate release, arguing that his age, history of

smoking, and various medical conditions, in light of the COVID-19 pandemic, constitute

extraordinary circumstances warranting a sentence reduction to time served or, at most, to 30

years' imprisonment.  Def.'s Mot. Compassionate Release at 3, 63.

The government opposes this request for compassionate release, arguing, first, that

defendant's failure to meet the compassionate release statute's exhaustion requirements leaves

this Court without jurisdiction, Gov't's Opp'n to Def.'s Emergency Mot. for Compassionate

Release Pursuant to 18 U.S.C. §3582(c)(1)(A)(i) ("Gov't's Opp'n Compassionate Release") at 9,

ECF No. 650; second, that, even if jurisdiction is proper, he has failed to demonstrate that

"extraordinary and compelling reasons" support a sentence reduction, *id.* at 16; and, third, that

defendant has not met his burden of establishing that a sentence reduction is warranted

considering the relevant 18 U.S.C. § 3553(a) factors, *id.* at 23.  As set forth below, defendant's health conditions do not qualify as extraordinary and compelling reasons for relief, and defendant's motion for compassionate release is therefore denied.

### *1. Legal Standard*

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed;' but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011) (quoting 18 U.S.C. § 3582(c)).  As originally enacted, one such exception, codified in 18 U.S.C. § 3582(c)(1)(A), empowered the BOP Director to petition the court "to reduce the term of imprisonment . . ." and gave courts the authority to grant those petitions if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," *id.*, they found that "extraordinary and compelling reasons warrant such a reduction."  Pub. L. No. 98-473, Title II, § 212(a)(2), 98 Stat. 1837.  The First Step Act expanded the exception in section 3582(c)(1)(A) to authorize a defendant to file a motion for such compassionate release directly with the court after exhausting any "administrative rights to appeal a failure of the Bureau of Prisons to bring a [compassionate release] motion" on his behalf or waiting at least "30 days" after he delivers his request for compassionate release to "the warden of [his] facility."  18 U.S.C. § 3582(c)(1)(A).

In resolving motions for compassionate release, the court may only reduce a term of imprisonment "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable," *id.*, and upon finding that "extraordinary and compelling reasons warrant such a reduction," *id.* § 3582(c)(1)(A)(i). [20]

---

[20] The Sentencing Commission's policy statement U.S.S.G. § 1B1.13, establishing requirements for BOP motions for compassionate release, is "not applicable to compassionate release motions filed by defendants" under the First Step Act, *United States v. Long*, 997 F.3d 342, 347 (D.C. Cir. 2021), and thus must not be treated as "binding" in that context, *United States v. Johnson*, 858 Fed. Appx. 381, 384 (D.C. Cir. 2021).

2.      *Exhaustion*

Defendant asserts that he satisfied the exhaustion requirement when he submitted a request for compassionate release to the warden of FCI Ray Brook, where he was then housed, on May 21, 2020, and it was denied more than 30 days before he filed for relief in this Court. Def.'s Mot. Compassionate Release at 17; Def.'s Reply Supp. Compassionate Release at 1.  The government contends nonetheless that defendant has not exhausted his administrative remedies, because he "did not reference the medical conditions he now cites as a basis for granting extraordinary relief" in his initial request to the warden, and thus "has never given BOP the opportunity to consider his asserted medical conditions as bases for his request for compassionate relief."  Gov't's Opp'n Compassionate Release at 9–10.  Defendant counters that the motion is properly before the Court, as there is "'no requirement that the basis for the defendant's motion for compassionate release to the court be identical to the basis of the defendant's request to the warden of the BOP.'"  Def.'s Reply Supp. Compassionate Release at 2 (quoting *United States v. Gluzman*, No. 96-cr-323 (LJL), 2020 WL 4233049, at *11 (S.D.N.Y. July 23, 2020)).

Even if his initial request were insufficient, defendant notes that he requested compassionate release a second time on December 24, 2020, "based on every ground raised in his motion for compassionate release," which request BOP denied on January 12, 2021.  *See* Def.'s Notice and 2d Suppl. Supp. Compassionate Release at 2; *see also* Def.'s Mot. Compassionate Release, Ex. M, Request for Compassionate Release at 2–4, ECF No. 667-1. Contrary to the government's position, as this Court has elsewhere explained, the compassionate release statute's "exhaustion" requirement is neither jurisdictional nor a mandatory claims processing rule and may be waived when exhaustion "would be futile."  *United States v. Morris*, No. 12-cr-154 (BAH), 2020 WL 2735651, at *3–6 (D.D.C. May 24, 2020) (internal quotation

marks omitted).  Even if the government were correct that defendant's motion for compassionate release must be limited to precisely those claims the inmate made to the warden of his facility, a denial on that basis here would be futile.  The warden has already made his position clear: he does not believe defendant is in a debilitated medical condition.  The government's bid to have defendant's motion thrown out on exhaustion grounds is thus rejected.

### 3.     *Extraordinary and Compelling Circumstances*

Defendant argues that his age, history of smoking, and various medical conditions including "hypertension, bradycardia (abnormally slow heart rate), borderline obesity, debilitating osteoarthritis, and [gastroesophageal reflux disease] GERD," constitute extraordinary and compelling circumstances warranting a sentence reduction, in light of the COVID-19 pandemic.  Def.'s Mot. Compassionate Release at 8.  The government argues that defendant has not demonstrated any extraordinary and compelling reason for a reduction in sentence, "as his medical records demonstrate that he does not suffer from any chronic medical condition that has been identified by the Centers for Disease Control as elevating his risk of becoming seriously ill from COVID-19," Gov't's Opp'n Compassionate Release at 1, and also notes defendant's documented refusal of the Pfizer-BioNTech COVID-19 vaccine as "further support for the government's view," Gov't's Suppl. to Opp'n to Def.'s Emergency Mot. for Compassionate Release at 1 ("Gov't's Suppl. Opp'n Compassionate Release"), ECF No. 676.  The burden on a defendant seeking compassionate release is high:  "Cutting short a duly authorized prison sentence is, in the statute's own words, an 'extraordinary' step to take, and it requires a justification which is more than sympathetic and indeed nothing short of 'compelling.'"  *United States v. Shabazz*, No. 17-cr-43 (JDB), 2021 WL 4306129, at *3 (D.D.C. Sept. 22, 2021).  Considering the current state of the pandemic and for the reasons set forth below, the Court

agrees with the government that defendant has not demonstrated extraordinary and compelling reasons to warrant a sentence reduction.

Several of defendant's conditions, including his bradycardia, GERD, and osteoarthritis, are not considered to increase an individual's risk of COVID-19 complications, nor are they otherwise sufficiently serious medical conditions to "compel[]" compassionate release. *See People with Certain Medical Conditions*, CDC (Dec. 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html ("CDC Risk Factors"); *COVID-19: Who's at Higher Risk of Serious Symptoms?*, Mayo Clinic (Dec. 17, 2021), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301 ("Mayo Clinic Risk Factors"). While, as defendant argues, these "institutions do not have a monopoly on information about COVID-19 risks," this guidance "is 'material' and frequently relied on by courts assessing motions for compassionate release." *United States v. Morales*, No. 06-cr-248-4 (JDB), 2021 WL 4622461, at *4 (D.D.C. Oct. 7, 2021) (citing *United States v. Powell*, 468 F. Supp. 3d 398, 403 (D.D.C. 2020)). Furthermore, defendant's bloodwork showing potential signs of chronic kidney disease and diabetes, Def.'s Mot. Compassionate Release at 31–32, is insufficient documentation of a medical condition to constitute "extraordinary and compelling" grounds for release, without formal diagnoses. Indeed, further weighing against finding that defendant's medical conditions are sufficiently serious to warrant compassionate release is the fact that BOP has classified defendant's medical care as "Care Level 1" and his "inmate profile reflects that he is cleared for regular work duties, with no medical restrictions." Gov't's Opp'n Compassionate Release at 20.

Defendant's personal characteristics as an over-50 year old African American man and his other medical conditions, namely his history of smoking, obesity, and hypertension, provide

somewhat stronger support for his argument of heightened susceptibility to COVID-19. *See* CDC Risk Factors; Mayo Clinic Risk Factors.  As the government concedes, smoking is a risk factor for severe COVID-19 infection, Gov't's Opp'n Compassionate Release at 20, but there is "no indication in the BOP medical records from 2019 or 2020" that defendant was or is a smoker, *id.*  Defendant has supplemented the record to reflect his smoking history, *see* Def.'s 1st Suppl. Evidence Supp. Compassionate Release at 1 (submitting "receipts showing [defendant]'s addiction to smoking, and purchase of Newport cigarettes from the BOP commissary, throughout 2004 and 2005"), and the Court has no reason to question this evidence that he was smoker at least until about 2005.  As for defendant's obesity, the medical records filed in support of defendant's motion reported his current weight, as of March 9, 2020, of 214 pounds.  Def.'s Mot. Compassionate Release at 9.  As the government notes, for a person of defendant's height, this corresponds to a Body Mass Index (BMI) of 29.02 kg/m, below the threshold of 30 kg/m at which an individual is considered obese.  *See* Gov't's Opp'n Compassionate Release at 18 (citing Def.'s Mot. Compassionate Release, Ex. A at BOP_046, ECF No. 648-1).  After defendant was again evaluated by BOP medical staff in December 2020, he supplemented the record with evidence that his current weight is 228 pounds, corresponding to a BMI of 30.9 kg/m, which qualifies as obese.  *See* Def.'s Notice and 2d Suppl. Supp. Compassionate Release at 2.  Both of these conditions support an argument that defendant is at somewhat of a heightened risk for complications from COVID-19.

Regarding defendant's asserted hypertension, the government questions the sufficiency of the evidence, noting that defendant "cites to specific, individual[] blood pressure readings taken under sometimes stressful situations (post-injury, post sickness), and after exertion," rather than to any "specific diagnoses."  Gov't's Opp'n Compassionate Release at 18.  Defendant counters

with several cases where a defendant was granted compassionate release based on "similar evidence of hypertension," Def.'s Reply Supp. Compassionate Release at 13, but in several of the cases cited, this pattern of high blood pressure readings suggestive of hypertension was accompanied by other serious and better documented medical conditions weighing in favor of compassionate release, such as permanent liver damage from a previous Hepatitis C infection, *see United States v. Bernard*, No. 3:97-cr-48 (RNC), 2020 WL 4462878, at *1 (D. Conn. Aug. 4, 2020); or the defendant's inability to "control his psoriatic arthritis and severe plaque psoriasis without the use of immunocompromising drugs that would render him particularly vulnerable to COVID-19," *United States v. Nemec*, No. 16-cr-134 (SI), 2020 WL 4547158, at *2 (N.D. Cal. Aug. 6, 2020); *see also United States v. Orji*, 486 F. Supp. 3d 398, 402 (D.D.C. 2020) (finding that defendant had "not carried his burden of demonstrating that his hypertension [was] an extraordinary and compelling reason for release" where "the record [did] not establish whether defendant's hypertension [was] severe enough to merit release" and there were "no medical records to confirm his diagnosis"); *Morales*, 2021 WL 4622461, at *5 (noting that "'controlled or benign hypertension' usually does not constitute extraordinary and compelling circumstances" and "ordinary hypertension only 'possibly' 'make[s] [a patient] more likely to get severely ill from COVID-19'" (quoting CDC Risk Factors)). [21]   Defendant's potential, yet-undiagnosed hypertension alone, therefore, does not amount to an "extraordinary and compelling reason" to merit a sentence reduction.

---

[21]     The other cases cited by defendant are also distinguishable:  in *United States v. Hernandez Frometa*, No. 18-cr-660 (AKH), 2020 WL 6132296, at *3 (S.D.N.Y. Oct. 19, 2020), defendant appears to have had a hypertension diagnosis, uncontested by the government, as well as a "pattern of elevated high blood pressure readings."  In *United States v. Lewis*, the government had conceded that defendant "suffer[ed] ailments that qualify as extraordinary and compelling reasons." No. 3:18-cr-138 (MHL), 2020 WL 6049913, at *4 (E.D. Va. Oct. 13, 2020).

Early in the pandemic, when little was known about how the virus spread and who was most at risk, and with "vaccines months (or more) away," *United States v. Johnson*, 464 F. Supp. 3d 22, 37 (D.D.C. 2020 (internal citations omitted)), defendant's combined afflictions of hypertension and slight obesity, alongside his history as a smoker and personal characteristics, might have sufficed to constitute "extraordinary and compelling reasons," *see, e.g., United States v. Mason*, 471 F. Supp. 3d 225, 226 (D.D.C. 2020) (granting compassionate release to a "50-year-old African-American male with hypertension"), although these conditions would put defendant at risk both inside and outside federal custody.  Regardless, "suffice it to say, it is no longer early in the pandemic."  *Morales*, 2021 WL 4622461 at *5.  Today, the widespread availability of vaccinations, including within BOP facilities, and the low infection rates at FCI Hazleton, where defendant is now housed, outweigh any heightened risk of COVID-19 complications which might be posed by defendant's personal characteristics and medical conditions.  Granting compassionate release to defendant on these bases at this point in the pandemic risks creating sentencing disparities between similarly situated defendants.  *See United States v. Miller,* No. 20-3079, 2021 WL 5537694, at *1 (D.C. Cir. Nov. 22, 2021) (finding "the district court acted within its discretion in determining that appellant failed to demonstrate that his risk of complications or death from COVID-19 constituted an extraordinary and compelling reason warranting compassionate release, especially in light of appellant's refusal of available treatment"); *United States v. Clark*, No. 10-cr-133 (PLF), 2021 WL 5630795, at *2, 5 (D.D.C. Dec. 1, 2021) (denying compassionate relief despite defendant's multiple chronic medical conditions, including obesity, and personal characteristics as an African American man); *United States v. Spann*, No. 19-cr-252 (ABJ), 2021 WL 4192046, at *2 (D.D.C. Sept. 15, 2021) (denying relief because "the record in this case does not show that [defendant] is in particular

danger at this time" and because "there is little evidence that [coronavirus] remains an issue at present, at least at [defendant's facility]").

To date, BOP has fully vaccinated 550 staff members and completed 2,645 inmate inoculations at FCI Hazleton.  *See* BOP, *COVID-19 Vaccine Implementation* (last updated Dec. 27, 2021), https://www.bop.gov/coronavirus/index.jsp.  The BOP reports six active infections among FCI Hazleton's current total population of 2,007 inmates, and one case affecting a staff member.  *See id.*; BOP, *FCI Hazleton* (last visited Dec. 27, 2021) https://www.bop.gov/locations/institutions/haf/.  This low infection rate and overall increase in vaccinations at the facility where defendant is housed further reduces his risk of infection and accompanying complications from COVID-19.  *See, e.g., United States v. Jackson*, No. 1:19-cr-347, 2021 WL 1299439 (TNM), at *2 (D.D.C. Apr. 7, 2021) (holding that "statistics" on the number of inmates and staff members at defendant's facility who "ha[d] received both doses of the COVID-19 vaccine . . . undermine[d] [his] claims" for compassionate release); *Morales*, 2021 WL 4622461, at *4–5 (finding defendant had "failed to demonstrate an extraordinary and compelling reason justifying a sentence reduction" based on "the lack of support in his medical records for certain of his alleged ailments [and] the current state of the pandemic" as well as the fact that defendant was vaccinated, "none of his more than 1700 fellow inmates [was] currently positive for the disease, and [the facility] ha[d] implemented extensive protocols to mitigate the spread of COVID-19"); *Clark*, 2021 WL 5630795, at *4 (concluding that in light of vaccination and case rates at defendant's facility, defendant had "not established extraordinary and compelling reasons for a sentence reduction" and noting that "[g]iven this progress, 'it is not clear that prison presents the same heightened risk of COVID-19 exposure that it once did'"

(quoting *United States v. Edwards*, No. 03-cr-234, 2021 WL 3128870 (JDB), at *3 (D.D.C. July 22, 2021)).

Despite the encouraging vaccination rates at FCI Hazleton and across the BOP more generally, defendant is not vaccinated, having refused the first dose of the Pfizer-BioNTech COVID-19 vaccine on April 7, 2021. *See* Gov't's Suppl. Opp'n Compassionate Release at 1. The government asserts, correctly, that vaccination would diminish the "risk of serious complications from COVID-19" and thus "substantially mitigate any increased risk defendant has or claims to have based on potential exposure to COVID-19." *Id.* Were he to be vaccinated, he "would not be likely to suffer exacerbation of [his medical] conditions as a result of COVID-19 . . . because the vaccine would strengthen defendant's immune response to the virus, protecting him from getting sick or suffering severe health complications." *Id.* at 2.

Defendant counters that "he trusts the vaccine and will be vaccinated once released, but he does not trust the BOP to administer it or monitor his symptoms should he have any adverse effects," including because of negative past experiences with BOP medical care and ongoing frustration with the treatment he receives for his other conditions. Def.'s Reply to Gov't's Suppl. to Opp'n to Compassionate Release ("Def.'s Reply Suppl. Opp'n Compassionate Release") at 1–2, ECF No. 681. As the government recognizes, defendant has a right to make his own decisions about his healthcare, Gov't's Suppl. Opp'n Compassionate Release at 5, and as defendant notes, incarcerated people lack the same ability to consult a doctor of their choosing to discuss the pros and cons of vaccination that is available to the general population, Def.'s Reply Suppl. Opp'n Compassionate Release at 4. Nevertheless, to grant compassionate release to a defendant because of the risks posed to him by the COVID-19 pandemic, when he has refused to take steps to mitigate those risks, flies in the face of all logic, *see Miller*, 2021 WL 5537694, at *1

(affirming district court denial of compassionate release, "especially in light of appellant's refusal of available treatment"), and further risks creating sentencing disparities between similarly-situated defendants, *see, e.g.*, *Clark*, 2021 WL 5630795, at *4 ("The Court agrees with the United States that, because Mr. Clark is fully vaccinated against COVID-19, his circumstances lack the extraordinary and compelling character that would warrant a sentence reduction."). Numerous courts in this district have now recognized that "the remarkable effectiveness of these vaccines raises an extremely high bar to establishing extraordinary and compelling reasons for a sentence reduction based on the risk of contracting COVID-19." *Id.* (collecting cases). Defendant cannot appeal to his self-inflicted unvaccinated status to surmount that bar here.

In light of the current status of the COVID-19 pandemic both nationally and within defendant's facility, the Court finds that the defendant's medical conditions, combined with his personal characteristics and history of smoking, do not represent extraordinary and compelling reasons for a reduction in his sentence. Since defendant has not presented extraordinary and compelling reasons for compassionate release, the 18 U.S.C. § 3553(a) factors need not be considered further, as "an inmate may not be granted compassionate release without a finding of an extraordinary and compelling reason, no matter how the § 3553(a) factors shake out." *Shabazz*, 2021 WL 4306129, at *6.

## III.   CONCLUSION

For the foregoing reasons, defendant is not eligible for a sentence reduction on his conviction for an offense not covered by Section 404(b) of the First Step Act, namely Count 6 (CCE murder), and, consequently, his current life sentence remains final and may not be reduced. In addition, defendant has failed to present extraordinary and compelling circumstances

due to the COVID-19 pandemic warranting his compassionate release under 18 U.S.C.

§ 3582(c)(1)(A).  Defendant's motion for a sentence reduction under Section 404(b) of the First

Step Act and his motion for compassionate release are therefore denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: December 28, 2021

_____
BERYL A. HOWELL
Chief Judge