## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 95-154-2 |
| CALVIN SUMLER, | Judge Beryl A. Howell |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is defendant Calvin Sumler's second *pro se* Motion for Compassionate Release ("Def.'s Mot."), ECF No. 730, pursuant to amendments made by the First Step Act of 2018, to compassionate release authority, as codified at 18 U.S.C. § 3582(c)(1)(A). *See* Pub. L. No. 115-391, title VI, § 603(b), 132 Stat. 5194, 5239-41.  The government contends that this motion should be summarily denied for failure to exhaust administrative remedies, which the government further urges should be treated as a mandatory requirement without exception. United States' Opp'n to Def.'s Mot. ("Gov't's Opp'n") at 5-6, ECF No. 731.  While not adopting the government's view of the administrative exhaustion requirement set out in § 3582(c), upon consideration of this motion, defendant's exhibits accompanying the motion, ECF No. 730-1, and the entirety of the underlying record, defendant's motion is **DENIED** for the reasons set forth below.

## I.    BACKGROUND

Defendant's motion adds another docket entry to the lengthy procedural history of this matter.  *See, e.g.*, *United States v. Sumler*, No. 95-cr-154-2 (BAH), 2021 WL 6134594 (D.D.C. Dec. 28, 2021) (denying defendant's motion for a reduced sentence under Section 404 of the First Step Act and defendant's motion for compassionate release), *appeal dismissed* No. 22-3005, 2025

WL 1559787 (D.C. Cir. May 30, 2025); *United States v. Sumler*, 95-cr-154 (BAH) (D.D.C. Mar. 5, 2018), ECF No. 596 (denying defendant's second § 2255 habeas motion); *United States v. Sumler*, 95-cr-154 (SS) (D.D.C. Jan. 13, 2000), ECF No. 548 (denying defendant's first § 2255 habeas motion); *United States v. Sumler*, 136 F.3d 188 (D.C. Cir. 1998) (affirming defendant's convictions).

"Defendant Calvin Sumler led 'the so-called Fern Street Crew, an organization which distributed crack cocaine for seven years in the District of Columbia and Maryland' between 1988 and 1995." *Sumler*, 2021 WL 6134594, at *1 (quoting *Sumler*, 136 F.3d at 189). The organization distributed "according to a conservative estimate, over 50 kilograms of crack cocaine" and facilitated this distribution "by its use of violence to defend territory from rival drug dealers and subvert the efforts of the criminal justice system." *Id.* (citing Def.'s Presentence Investigation Report ("PSR") ¶¶ 154-55, ECF No. 685 (sealed) and then quoting *Sumler*, 136 F.3d at 189).[1] At the sentencing hearing, the government explained that the estimate for the amount of crack sold "were extremely conservative, and by that I mean it excluded, it excluded amounts of drugs that were sold by co-conspirators that didn't directly pass through [defendant's] hands that he could be legally charged for." Sent'g Hr'g Tr. (Nov. 18, 1996) at 4:6-9.[2]

Defendant routinely used violence to further the ends of the organization. Defendant "regularly exhorted his group not to obtain crack from anyone from outside the neighborhood" and "regularly threatened and chased off potential competitors in the neighborhood." PSR. ¶ 46.

---

[1]    The PSR is filed under seal and unsealed to the limited extent that sealed content is referenced in this Memorandum Opinion to explain the Court's reasoning. *See United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009).

[2]    The estimate relied on co-conspirator testimony, so, for instance, during the two-year period between 1988 and 1990, where there was "only . . . testimony about two kilos of crack that was sold in that time period," that number was used for the PSR's calculations even though a gross underestimate. Sent'g Hr'g Tr. at 5:8-11 (government speaking).

On one occasion, defendant and three others found a competing seller in the neighborhood, "picked him up[,] and threw him through a window. *Id.* ¶ 47. On another occasion, defendant and others, upon learning that rival sellers were preventing one of defendant's workers from selling in the neighborhood, "quickly drove up to the area with firearms and a shootout ensued." *Id.* Defendant "also enlisted [others] to help rob rival drug dealers." *Id.* ¶ 41. Trial testimony established that defendant and "the members of his organization regularly carried firearms to defend themselves, and to intimidate, assault, and murder." *Id.* ¶ 98. Specific acts of violence directed by defendant and carried out by him and other members of the Fern Street Crew are described briefly below.

### A.    Murder of Damon Chase and Obstruction of Justice

Defendant was not always the leader of the Fern Street Crew; the organization was established by Kevin Moore in the mid-1980s. PSR ¶ 35. In September 1988, Moore murdered Reginald Simpson because Simpson owed him $300 for crack cocaine. PSR ¶ 72; Sent'g Hr'g Tr. at 32:13-14. David Ballinger, Moore's right-hand man, and Damon Chase were involved in the murder, fighting Simpson before Moore ultimately pulled the trigger. PSR ¶ 72; Sent'g Hr'g Tr. at 42:22-43:5. Moore and Chase were both arrested, charged with the murder, and then released pending trial. PSR ¶¶ 72-73. Concerned that Chase would cooperate and testify against him, Moore raised the issue with defendant and others. *Id.* at 73.

On December 24, 1989, defendant ordered Michael Jefferson to kill Chase so that Chase would be unable to testify at Moore's trial. *Id.* ¶¶ 75, 78. Jefferson picked up Chase from his grandmother's house and shot him in the head. *Id.* ¶¶ 75-76. As compensation, Moore paid Jefferson one-half ounce of crack cocaine. *Id.* ¶ 77. Ballinger, the other individual involved in the Simpson murder, learned of this killing and, afraid for his safety, entered the federal witness protection program. *Id.* Defendant organized false testimony from four other witnesses, and testified falsely himself, at Moore's trial. *Id.* ¶ 79. Despite defendant's best efforts, Moore was

convicted. *Id.* As a result of Moore's incarnation, in 1990, defendant's control over the Fern Street Crew increased. *Id.*; Sent'g Hr'g Tr. at 65:18-20 (AUSA: "[W]hen Kevin Moore was convicted, there was one man who stepped in and expanded this business day in and day out, Calvin Sumler. For one reason and one reason only, greed and money[,] and he didn't care at what cost.").

### B.    Murder of Kahn Daly and Attempted Murder of Juan Nino

Shortly thereafter, in late 1990, defendant ordered Jefferson and Aaron Rogers, another member of the Fern Street Crew, to drive out of business a competing drug dealer named Kahn Daly. *Id.* ¶ 80. Jefferson and Rogers twice warned Daly to stop selling drugs in the neighborhood and, as part of the second warning, threatened to shoot him. *Id.* On December 16, 1990, after an attempted robber of another drug dealer, Rogers, Jefferson, and a third member of the Fern Street Crew spotted Daly walking with his friend Juan Nino. *Id.* ¶ 81. Rogers and Jefferson left the car they were in and donned masks. *Id.* Jefferson caught up to Nino and forced him into an alleyway at gunpoint. *Id.* Rogers caught up to Daly, took him to an alleyway, shot him in the head, killing him, and then took his money. *Id.* Rogers ran back to Jefferson and shot Nino in the back of the head, but Nino survived. *Id.*

In February 1991, Jefferson and Rogers were both arrested for the murder of Daly and shooting of Nino. *Id.* ¶ 82. Police told Rogers that Jefferson had incriminated him for the murder, so Rogers gave a written statement blaming Jefferson for the murder and identifying Anthony Hinton as an alibi witness. *Id.*

### C.    Murder of Anthony Hinton, Attempted Murder of Raymond Harris, Assault of Linwood Brooks, and Obstruction of Justice

Throughout 1991, defendant was concerned that Hinton was "messing up" the neighborhood by stealing crack cocaine from other sellers. *Id.* ¶ 83. Additionally, defendant

believed that Hinton and his brother, Raymond Harris, were informants for the D.C. Metropolitan Police Department and that Hinton would testify for the government at the trial of Jefferson and Rogers for the murder of Daly. *Id.* Defendant complained to other co-conspirators about Hinton, Harris, and Linwood Brooks, "a neighborhood crack head," instructing the co-conspirators that they needed to "clean up the neighborhood" by killing Hinton and Harris. *Id.* ¶¶ 83-84. Defendant also visited Rogers in jail and told him that he would "take care" of Hinton so that Hinton would be unable to testify at the Daly murder trial. *Id.* ¶ 84.

On Halloween night 1991, defendant and Jamal Colbert arranged to pick up a 9-millimeter pistol, and Colbert told the firearm supplier that they were planning a "power move" that night. *Id.* ¶ 85. Later that night, Sumler told Colbert and two others, all armed with pistols, "Let's clean up the Avenue tonight." *Id.* ¶ 86. The group found Hinton and Brooks. *Id.* One individual assaulted Brooks by "beat[ing] him up." *Id.* Defendant told Hinton to walk towards him and then shot Hinton in the chest. *Id.* ¶ 87. Hinton ran away as defendant and one other continued to shoot at him. *Id.* Hinton's body was found the next day. *Id.*

Defendant attempted to murder Hinton's brother Harris that same night. *Id.* ¶ 88. He and Colbert slashed all four tires on Harris's car and laid in wait for Harris to walk down a path he would have to take to get home, hoping to have the opportunity to ambush and kill him. *Id.* Harris saw that the tires on his car had been slashed but, rather than walk home, decided to drive home on four flat tires. *Id.*

Hinton's grandmother would later tell the probation officer that "[o]ne of the most painful aspects of Anthony [Hinton]'s death . . . is that the people responsible for his death came to her home, after they murdered Anthony, and ate meals at her table." *Id.* ¶ 182. Indeed, the group

"continued to associate with Raymond Harris, whom they [had] also tried to murder, even after they [had] murdered his brother." *Id.*

With Hinton dead and unable to testify, defendant turned his attention to other witnesses in the Daly murder case. Two street-level members of the Fern Street Crew had informed police officers and the grand jury that Jefferson and Rogers had been armed the night of the Daly murder. *Id.* ¶ 89. Defendant, Jefferson, and Colbert threatened and pressured the two witnesses not to testify about the night of the Daly murder. *Id.* At the trial, the two denied having any knowledge of whether Jefferson and Rogers were armed that night. *Id.* Consequently, Jefferson and Rogers were acquitted of the murder charges and released in May 1992. *Id.*

### D.    Second Assault of Linwood Brooks

On September 28, 1992, Jefferson, Rogers, and two others assaulted Linwood Brooks on the suspicion that he was acting as a police informant. *Id.* ¶ 90. They threw him down, beat him with a pole, cut off all of his clothes, and left him in the middle of the street. *Id.* The next day, defendant, Jefferson, and a third man offered Brooks either $250 or crack cocaine not to press charges. *Id.* Brooks did not press charges. *Id.*

### E.    Murder of Ucal Riley

In the summer of 1992, Ucal Riley, a Jamaican drug dealer, began to expand his business and steal customers from the Fern Street Crew. *Id.* ¶ 92. Defendant complained to Lawrence Glover, another member of the Fern Street Crew, that Riley was taking their customers. *Id.* On October 6, 1992, Gerald Smith, Jefferson's cousin and a violent enforcer in the Fern Street Crew, suggested to Glover that they rob Riley of an eighth of a kilogram of crack cocaine. *Id.* ¶ 93. Glover paged Riley about making a drug purchase, and when Riley arrived with another individual, Smith told Riley that he wanted to take a ride with Riley to make the deal. *Id.* ¶ 93-94. Smith instructed Glover to kill the other individual accompanying Riley, while Smith and Riley were

completing the transaction; Glover did not kill the other individual. *Id.* ¶ 94. Riley drove Smith several blocks away. *Id.* ¶ 95. Riley asked for the money first, but Smith refused; Smith asked for the crack cocaine first, but Riley refused. *Id.* Smith pulled out a 10-millimeter pistol and shot Riley several times in the head, sending pieces of his head, ear, and skull in and around the interior of the car. *Id.* Smith took the crack cocaine and later gave some of it to Glover. *Id.*

### F.    The Fern Street Crew's "War" with the Allison Street Group

In late 1992, the Fern Street Crew became engulfed in a "War" with the Allison Street group, a rival drug organization. *Id.* ¶ 54. On October 19, 1992, Smith, the Fern Street Crew's enforcer, and Jefferson decided to rob the Allison Street group. *Id.* ¶ 55. They drove to an alleyway on Allison Street where they met, under the pretense of purchasing marijuana, Marcus Murray and Anthony Welch. *Id.* Smith pulled out a gun and shot Murray in the head, killing him, before shooting Welch five times. *Id.* Welch managed to survive by falling to the ground and hiding underneath a truck. *Id.* After shooting Welch, Smith and Jefferson continued shooting Murray's body. *Id.* Fleeing the scene, Jefferson killed Victor Hartnett, an older man who just happened to be in the vicinity as they were running back to their car. *Id.* ¶ 56. Jefferson shot Hartnett five times to make sure that he was dead. *Id.*

The Allison Street group's retaliation was swift: the next day, they shot Jefferson in the stomach, hospitalizing him for several weeks. *Id.* ¶ 57. Defendant sought revenge. For several nights, clad in bulletproof vests, he and at least a half dozen other members of the Fern Street Crew, armed with a sawed-off shotgun, various semi-automatic firearms, and assorted pistols, waited for the Allison Street group to pass through. *Id.* ¶ 58. Defendant spotted a car driven by the Allison Street Group and was prepared to attack when a police car pulled out at a stop sign. *Id.* No attack occurred. *Id.*

On October 23, 1992, the Allison Street group shot a member of the Fern Street Crew in a drive-by shooting. *Id.* ¶ 59. Defendant again set out for revenge. On October 26, 1992, defendant and five others in two cars began looking to strike back at the Allison Street group. *Id.* ¶ 60. Rogers, Colbert, and two others, all armed with firearms, were driving in the lead car with defendant and another member of the Crew following in the trail car. *Id.* At an intersection, a van ambushed the lead car and began firing. *Id.* Colbert was shot in the head and killed. *Id.* The Crew members in the trail car returned fire at the van. *Id.*

### G.     The Fern Street Crew's "War" with the "Twins"

Beginning late 1992 and continuing into 1993, the Fern Street Crew entered into a "war" with a rival drug gang led by the "Twins." *Id.* ¶ 61.

On December 1, 1992, Smith and two others lured Eric Brake, a member of the Twins' gang into an apartment. *Id.* ¶ 62. They put a pillowcase over his head and demanded to know the location of his drugs and money as well as the locations of the drugs and money of the Twins' gang. *Id.* The three beat Brake for several hours before driving him in a van around Washington, D.C. and Maryland so that he could identify locations of other members of the Twins' gang. *Id.* ¶¶ 62-63. They then placed electrical tape over Brake's eyes and mouth and drove him to a park in Laurel, Maryland. *Id.* ¶ 63. Smith took Brake into the woods and shot him in the head, leaving him for dead. *Id.* Brake regained consciousness several hours later and stumbled in the woods until he encountered a passerby. *Id.* ¶ 64. The bullet had passed through his jaw, cut his jugular, and lodged into his shoulder. *Id.*

On July 7, 1993, Rogers and three others attempted to rob Andrew Havens, a drug dealer who worked for the Twins. *Id.* ¶ 65. While armed, they started to approach Havens, but a shootout ensued when a friend of Havens began shooting at the group from across the street. *Id.* The four

left in their car.  *Id.*  Havens was shot in the leg.  *Id.*  Later that night, the Twins and their gang returned to the scene and shot at Jefferson, Rogers, and a third Fern Street Crew member.  *Id.*

On July 21, 1993, Havens and an associate spotted Rogers and his girlfriend parked in a car in front of Rogers's house.  *Id.* ¶ 66.  As Rogers stepped out of his car, Havens and his associate drove past Rogers and shot him five times.  *Id.*

Jefferson and several others received two bulletproof vests from defendant and met at Rogers' house.  *Id.* ¶ 67.  They took two cars to the Twins' family house, stopped their cars, and fired at the house.  *Id.*  A woman was the sole occupant of the house, and her two six-year-old twins were playing outside.  *Id.*  Astonishingly, no one was hurt.  *Id.*  The woman later informed the probation officer that at the time of the shooting, "[s]he knew her children were playing in the front, and thought they were dead.  After the shooting, her children were screaming, and were hysterical.  Now, three years later, they still have not recovered.  Every night, they pray to God that they won't be hurt."  *Id.* ¶ 189.

## H.    Attempted Robbery of Maurice Felder and Obstruction of Justice

Also in the summer of 1993, the Fern Street Crew developed a problem with Maurice Felder, a drug dealer who at one point  had obtained crack from defendant but later switched to a different supplier.  *Id.*  ¶ 68.  Defendant complained to his co-conspirators that Felder and his group had grown too large and were beginning to take too many customers from the Fern Street Crew.  *Id.*

In the early morning hours of July 8, 1993, Jefferson, Rogers, and three others planned an attack against Felder.  *Id.* ¶ 69.  While two of the Fern Street Crew waited in the car, Jefferson and one other, both armed, approached Felder and told him to move towards the wall.  *Id.*  Luckily, police officers passed by and observed the situation.  *Id.*  Jefferson and two others darted through an alleyway to stash their guns while their two friends in the car drove around to look for them.

*Id.* At this time, a car from the Twins' group drove past and, in retaliation for the shooting of Havens that had occurred only hours before, *see infra* Part I.G, fired at the three fleeing on foot. *Id.* The three were later arrested for the attempted robbery of Felder. *Id.* ¶ 70.

Glover told Felder's friend, who was a witness to the attempted robbery, that defendant and Jefferson would provide money or crack in exchange for his cooperation. *Id.* ¶ 71. Felder was pressured to give a false statement to defense investigators denying that the attempted robbery had ever occurred. *Id.* The charges were eventually dropped. *Id.*

## I.    Other Efforts to Obstruct Justice

In the summer of 1995, upon learning of the grand jury's investigation, defendant pressured his girlfriend not to cooperate with law enforcement and to withhold information from the grand jury. *Id.* ¶ 164. His girlfriend proceeded to lie to the grand jury. *Id.* Before his arrest, defendant hired an investigator to obtain a statement from Harris, falsely stating that Harris had never obtained illegal drugs from defendant. *Id.* ¶ 165. Finally, after his arrest, defendant told his co-conspirators to stick together. *Id.*

## J.    Convictions and Sentencing Proceedings

"In July 1995, defendant was charged in a 61-count indictment with 11-codefendants." *Sumler*, 2021 WL 6134594, at *2. Seven co-defendants entered cooperating agreements, but defendant and four other co-defendants proceeded to trial. *Id.* at *1 n.2. The government moved for the trial to be held in a special courtroom "designed for enhanced security purposes" which "ha[d] a twelve-foot high locked plexiglass partition separating the spectator section from the counsel tables, jury box and bench." Mem Op. at 2 (Mar. 28, 1996), ECF No. 246. The Court found that because the defendants were charged "with numerous acts of violence, including assault and several acts of murder, in furtherance of a conspiracy to distribute narcotics" and had been accused "of prior instances of witness intimidation" the special courtroom was appropriate

especially because "the Government ha[d] submitted a sworn affidavit detailing instances of alleged witness intimidation and threats against cooperating witnesses made by the Defendants." *Id.* at 3. Additionally, the parties "agreed that jurors [were to] be referred to by their jury number." *Id.* at 1 n.1. "Following a four-month trial, a jury found defendant guilty of . . . eleven of the thirteen counts with which he was charged[.]" *Sumler*, 2021 WL 6134594, at *2.

Defendant was sentenced on ten of those counts: one count of Super Continuing Criminal Enterprise (21 U.S.C. § 848(a) and (b)) (Count 2); one count of conspiracy to participate in a racketeer influenced corrupt organization (18 U.S.C. §§ 1962(d) & 1963(a)) (Count 3); one count of armed first degree murder (22 D.C. Code §§ 2401, 3202 & 105) (Count 4); one count of continuing criminal enterprise murder (21 U.S.C. § 848(e)(1)(A)) (Count 6); one count of the use of a firearm during and in relation to a crime of violence or a drug trafficking crime (of victim Anthony Hinton) (18 U.S.C. § 924(c)) (Count 19); one count of possession of a firearm during a crime of violence (22 D.C. Code § 3204(b)) (Count 29); two counts of distribution of a cocaine base (21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii)) (Counts 38 and 39); and two counts of distribution of a cocaine base (21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii)) (Counts 40 and 41). *Sumler*, 2021 WL 6134594, at *2.[3]

In November 1996, defendant was sentenced, on separate counts, to five life sentences, two forty-year sentences, a sentence of twenty years to life, and a sentence of five to fifteen years, to be served concurrently, as well as a five-year consecutive sentence, to be followed by five years of supervised release, should he ever be released. *Sumler*, 2021 WL 6134594, at *4 & n.8; Min. Entry (Nov. 18, 1996). These convictions were upheld on direct appeal in March 1998. *Sumler*,

---

[3]    Count 1 (Crack Conspiracy) was vacated at sentencing because the underlying conduct was identical to the conduct establishing a necessary element of Count 2. Sent'g Hr'g Tr. at 72:24-73:1; *see also Sumler*, 2021 WL 6134594, at *4.

11

136 F.3d at 192.  Over twenty years later, defendant's original First Step Act motion was denied, in 2021, without any reduction of his sentence or compassionate release relief.  *Sumler*, 2021 WL 6134594, at *2.  Defendant remains in Bureau of Prisons custody serving the remainder of his life sentences and five-year consecutive sentence.[4]

## II.    LEGAL STANDARD

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed;' but the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011) (plurality opinion) (quoting 18 U.S.C. § 3582(c)).  One such exception was created by the First Step Act of 2018, which authorizes the court to "modify a term of imprisonment once it has been imposed . . . in any case" when a defendant files a motion for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A); *United States v. Wilson*, 77 F.4th 837, 839 (D.C. Cir. 2023).

Upon satisfaction of the exhaustion requirement, a defendant's term of imprisonment may be reduced when the court, "after considering the factors set forth in section 3553(a) to the extent they are applicable," finds, first, either that "extraordinary and compelling reasons warrant such a reduction" or the defendant meets certain age criteria, and, second, "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i)-(ii).

---

[4]    Defendant represents that "[i]n 2023, he was paroled on the homicide count by D.C. authorities."  Def.'s Mot. at 6.  He has proffered a U.S. Parole Commission Notice of Action supporting this representation.  Def.'s Mot., Ex. at 58.  The government does not appear to dispute this assertion.  *See generally* Gov't's Opp'n.  Analysis will thus assume that defendant is currently serving four, rather than five, life sentences.

## III.    DISCUSSION

Defendant has marshalled multiple reasons in support of compassionate release, grouped into six general categories.  First, he identifies three relevant changes in law in the form of three amendments to the U.S. Sentencing Guidelines—Amendments 814, 821, and 829.  Def.'s Mot at 3.[5]  Second, he cites various health conditions, including bradycardia, hypertension, pre-diabetes, obesity, neutropenia, and GERD, which "qualify as extraordinary risks, especially when compounded by COVID-19 exposure in federal facilities."  *Id.* at 4.  Third, he raises family hardship, namely that defendant's "mother suffers from dementia and requires continuous care" and "[a]s a caregiver (and free man, if this petition is granted), his presence is essential."  *Id.* Fourth, defendant cites his mentorship over younger inmates, his "[t]housands of hours of programming completed," and his absence of "institutional history of violence" as evidence of his rehabilitation.  *Id.* at 5-6.  Fifth, in a category titled "Sentencing Disparities & Proportionality," defendant emphasizes his parole for the Hinton murder; an alleged disparity made evident by a comparison between his life sentences and the sentence of a Connecticut "gang leader directly convicted of murder" who "was granted release after ~30 years"; and the claim that "[t]he government offered [him] 30 years for 13 counts[,] he was convicted of 11 counts yet received life," and, therefore, he "has now served more than the plea offer—over 30 years, equivalent to 35 with good-time credit."  *Id.* at 6.[6]  Sixth, defendant identifies a "[r]obust release plan" encompassing housing, transportation, employment, and familial support.  *Id.* at 2, 7.

---

[5]    Defendant also cites "IRAA eligibility," referring to the D.C. Incarceration Reduction Amendment Act, *see* D.C. Code § 24-403.03.  Defendant fails to explain how or to what extent the enactment of a D.C. compassionate release statute should guide federal district courts' interpretation of whether a federally imposed sentence is unusually long or how "such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed."  U.S.S.G. § 1B1.13(b)(6).

[6]    This is not the first time that defendant has argued that he received this plea offer more than thirty years ago. The last time defendant raised this argument, "the government indicated that one of the trial prosecutors had been contacted and 'recalled that a plea offer was made to this defendant . . . pursuant to Rule 11(c)(1)(C)' but 'was unable

Nowhere in defendant's motion for compassionate release, however, are administrative remedies mentioned, let alone demonstrably exhausted. In the government's view, this dooms the pending motion, which should be "summarily" denied because he "has not exhausted his administrative remedies at the Bureau of Prisons (BOP)." Gov't Opp'n at 5. The government explains that "we view this requirement as a mandatory claims-processing rule, not a jurisdictional bar to this Court's consideration of the claims." *Id.* at 6 n.2 (citing *United States v. Franco*, 973 F.3d 465, 467 (5th Cir.), *cert. denied*, 141 S. Ct. 920 (2020)). The government's position raises a legal issue that remains unresolved in this Circuit and is addressed first, before turning to the effect of defendant's non-exhaustion of administrative remedies on his pending motion.

## A.    § 3582(c)(1)(A)'s Exhaustion Requirement Is Not Jurisdictional or Mandatory

To determine the effect that a failure to exhaust administrative remedies has on consideration of the pending compassionate release motion under 18 U.S.C. § 3582(c), the D.C. Circuit's general framework for assessing analogous statutory deadlines is helpful. Statutory deadlines "fall into one of three categories: (1) jurisdictional deadlines, which cannot be equitably tolled by the court or waived by an opposing party, (2) mandatory claims-processing deadlines, which are subject to equitable tolling unless properly raised by an opposing party, in which case they are unalterable, or (3) nonmandatory claims-processing deadlines, which are both subject to equitable tolling and flexible when raised by an opposing party." *Young v. Sec. & Exch. Comm'n*, 956 F.3d 650, 654-55 (D.C. Cir. 2020). The government concedes that the administrative exhaustion requirement set out in "section 3582(c)(1)(A) is a nonjurisdictional claim-processing

---

to recall the exact terms of the plea' and 'did not have 100% confidence in his recollection.'" *Sumler*, 2021 WL 6134594, at *6 (ellipses in original) (quoting Gov't Further Resp. to Court's Mar. 1, 2021 Min. Order at 3, ECF No. 662). Furthermore, "[t]he government never located any reference to a plea offer in the preserved trial documents." *Id.* (citing Gov't 2d Suppl. Resp. to Court's Mar. 1, 2021 Min. Order, ECF No. 664). Here, the government simply contends that even if defendant had been offered a plea deal, the terms offered are irrelevant. Gov't Opp'n at 8 ("Even if defendant was offered a plea and chose to proceed to trial, that is not an extraordinary or compelling reason, nor is it relevant. (citing *United States v. Fernandez*, 104 F.4th 420, 428 (2d Cir. 2024)).

rule," *Wilson*, 77 F.4th at 841; Gov't's Opp'n at 6 n.2, and, thus, does not fall into the first of the three general categories, meaning subject-matter jurisdiction may be exercised over the pending motion.

The remaining question is whether § 3582(c)(1)(A)'s exhaustion requirement falls into the second or the third category, since only in the latter category are equitable exceptions permissible to consider when, as here, the opposing party has raised the failure to exhaust administrative remedies. The answer to this question has been mixed on this Court. In March and April 2020, a barrage of compassionate release motions relating to the then-raging coronavirus pandemic were filed. In those circumstances, this and other district courts determined "that waiving the exhaustion requirement is appropriate here given the history of the compassionate release statute and the urgency of the COVID-19 pandemic," reasoning that the "First Step Act, which created the 30-day rule, 'was enacted to further increase the use of compassionate release,'" so "the 30-day exhaustion period is best understood as a method to expand and accelerate, rather than hinder, the ability of inmates to move for release." *United States v. Jennings*, No. 18-cr-17 (TSC), 2020 U.S. Dist. LEXIS 70800, at *4 (D.D.C. Apr. 22, 2020) (quoting *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019)). Therefore, "it would frustrate Congressional purpose to hold that it prohibits a decision on the merits in these exceptional circumstances." *Id.* at *4-5.

In May 2020, then-District Judge K.B. Jackson, in *United States v. Johnson*, first concluded that the administrative exhaustion requirement is not jurisdictional and further reasoned that "the requirement is reasonably construed as [a] claim-processing rule that is subject to waiver by the court or forfeiture by the government." 464 F. Supp. 3d 22, 29 (D.D.C. 2020) (KBJ). "This matters because non-jurisdictional statutory exhaustion requirements can be excused or forfeited—*e.g.*, for good cause, the court can proceed even if the exhaustion requirements are not satisfied—

whereas jurisdictional statutory exhaustion requirements are binding." *Id.* at 28. Therefore, "consistent with the generally accepted standards that courts have applied in similar circumstances, a court can excuse section 3582(c)(1)(A)'s exhaustion requirement where, among other things, 'the agency will almost certainly deny any relief either because it has a preconceived position on, or lacks jurisdiction over, the matter.'" *Id.* at 29 (quoting *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986)).

In *United States v. Morris*, this Court agreed with the reasoning presented in *Jennings* and *Johnson*, and determined that "[t]he text, context, and history of the compassionate release statute thus make clear that, far from enacting a bar to judicial review, 'the 30-day rule was meant as an accelerant to judicial review.'" No. 12-cr-154 (BAH), 2020 WL 2735651, at *6 (D.D.C. May 24, 2020) (quoting *United States v. Russo*, 454 F. Supp. 3d 270, 271 (S.D.N.Y. 2020)). Accordingly, treating § 3582(c)(1)(A)'s administrative exhaustion requirement as a non-jurisdictional and non-mandatory claim-processing rule subject to equitable waiver, this Court concluded that "defendants need not fulfill the statute's exhaustion requirements when 'there are exceptional circumstances of peculiar urgency or exhaustion would be futile.'" *Morris*, 2020 WL 2735651, at *6 (D.D.C. May 24, 2020) (quoting *Johnson*, 464 F. Supp. 3d at 28 n.2). This Court then waived the exhaustion requirement, "[g]iven the peculiar circumstances of this case, the limited time remaining to fashion effective relief should it be warranted, and the pressing urgency presented by the COVID-19 pandemic." *Id.* In 2021, this Court, considering this defendant's earlier compassionate release motion, again following *Morris*, gave defendant the benefit of addressing his unexhausted claims because exhaustion would have been futile. *Sumler*, 2021 WL 6134594, at *23.

Though the D.C. Circuit has not addressed this specific issue, since *Jennings*, *Johnson*, and *Morris* reasoned that the exhaustion requirement is nonmandatory, at least five U.S. Courts of Appeal have reached a different conclusion that 18 U.S.C. § 3582(c)(1)(A) "imposes a mandatory claim-processing rule that must be enforced when properly invoked." *United States v. Keller*, 2 F.4th 1278, 1282 (9th Cir. 2021) (per curiam); *see also Franco*, 973 F.3d at 468; *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020); *United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021); *United States v. Houck*, 2 F.4th 1082, 1084 (8th Cir. 2021); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("Although the District Court's indicative ruling did not mention the exhaustion requirement, it presents a glaring roadblock foreclosing compassionate release at this point.").[7]  These decisions rest largely on the language in § 3582(c) that "a 'court may not' grant relief without complying with the exhaustion requirement," which text is construed to "operate[] as an 'unyielding procedural requirement.'" *Alam*, 960 F.3d at 834 (quoting *United States v. Dowl*, 956 F.3d 904, 908 (6th Cir. 2020) (per curiam)); *see also Franco*, 973 F.3d at 468 ("The statute's language is mandatory. . . . It is a paradigmatic mandatory claim-processing rule.").  The Sixth and Ninth Circuits also identified the salutary effect that a mandatory "requirement promotes good policy" by "allow[ing] the government to 'implement an orderly system for reviewing compassionate-release applications,' rather than one 'that incentivizes line jumping,'" which, "in turn 'ensures that the prison administrators can prioritize the most urgent claims.'" *Keller*, 2 F.4th at 1282 (quoting *Alam*, 960 F.3d at 834-35).[8]

---

[7]    In *United States v. Jenkins*, the D.C. Circuit discussed § 3582(c)(1)(A)'s exhaustion requirement in passing and seemingly in mandatory terms; however, such discussion was antecedent to the D.C. Circuit's determination that the exhaustion requirement was non-jurisdictional and was so brief as to elide explanation of the alternate pathway, waiting thirty days, to satisfy the requirement.  50 F.4th 1185, 1205 (D.C. Cir. 2022).

[8]    How those described benefits will be realized is far from clear, given that, even if the Bureau of Prisons adopts an "orderly system" for prioritizing compassionate release motions, the statute does not provide much time to develop an administrative record and resolve even urgent claims because, after thirty days, defendants are permitted to jump to district court to file a compassionate release motion.

The weight of this authority has persuaded at least one other Judge on this Court that § 3582(c)(1)(A) sets out a mandatory claim-processing rule, *see, e.g.*, *United States v. Morales*, No. 6-cr-248 (JDB), 2021 WL 4622461, at *3 n.3 (D.D.C. Oct. 7, 2021); *United States v. Edwards*, No. 3-cr-234 (JDB), 2021 WL 3128870, at *2 & n.3 (D.D.C. July 22, 2021) (collecting Circuit court cases), reasoning that this categorization is consistent with "the Supreme Court's express instruction that 'mandatory language means a court may not excuse a failure to exhaust, even to take [special] circumstances into account,'" *United States v. Douglas*, No. 10-171 (JDB), 2020 WL 5816244, at *1 n.2 (D.D.C. Sept. 30, 2020) (brackets in original) (quoting *Ross v. Blake*, 578 U.S. 632, 639 (2016) (interpreting exhaustion provision of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, which imposes a jurisdictional bar that "[n]o action shall be brought . . . by a prisoner . . . until such administrative remedies as are available are exhausted")).

As a threshold issue, while the D.C. Circuit's categorization of mandatory versus nonmandatory claim-processing rules characterize only the latter as allowing consideration of equitable waiver when the opposing party raises lack of exhaustion, *Young*, 956 F.3d at 654-55, the Supreme Court has explicitly avoided reaching this conclusion. For example, in considering a federal appellate procedural rule rather than a statute, the Supreme Court held, that "[i]f properly invoked, mandatory claim-processing rules must be enforced, but they may be waived or forfeited," *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 (2017), and, at the same time, "reserved" the question of "whether mandatory claim-processing rules may be subject to equitable exceptions," *id.* at 20 n.3 (citing *Kontrick v. Ryan*, 540 U.S. 443, 457 (2004)). When subsequently addressing the applicability of exceptions to a nonjurisdictional, mandatory claim-processing rule set out in statute, the Supreme Court likewise reserved decision. *See Fort Bend County v. Davis*, 587 U.S. 541, 544 (2019) (discussing mandatory administrative exhaustion

requirement created by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, that "a 'charge . . . shall be filed' with the EEOC 'by or on behalf of a person claiming to be aggrieved' within 180 days 'after the alleged unlawful employment practice'" (ellipses in original) (quoting 42 U.S.C. § 2000e-5(b), (e)(1))); *id.* at 549 n.5 ("reserv[ing]" the question of "whether mandatory claim-processing rules may [ever] be subject to equitable exceptions" (second alteration in original) (quoting *Hamer*, 583 U.S. at 20 n.3)); *id.* at 552 (concluding that "a rule may be mandatory without being jurisdictional, and Title VII's charge-filing requirement fits that bill.").

Notwithstanding the Supreme Court's declination to date to rule on whether mandatory claim processing rules, whether procedural or statutory, may be subject to any equitable waiver, the D.C. Circuit has provided analytical guidance by highlighting the distinction between an administrative exhaustion requirement in a procedural rule, as in *Hamer*, and such a requirement in a statute, as in *Ross* and *Fort Bend County*.  The Court indicated that while, in the procedural rule context, "judge-made exceptions of that kind are available in the case of a judge-made exhaustion obligation, when an exhaustion requirement is imposed by statute, the only question is whether *Congress* intended any 'limits on a [litigant's] obligation to exhaust.'"  *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1098 (D.C. Cir. 2021) (insertion and emphasis in original) (quoting *Ross*, 578 U.S. at 639).  In contrast, "'mandatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion' to excuse the failure to exhaust, even under 'standard administrative-law exceptions' such as futility or hardship."  *Id.* (ellipses in original) (quoting *Ross*, 578 U.S. at 639, 642 n.2).

Since the administrative exhaustion requirement in § 3582(c) is statutory rather than judge-made, the question whether this requirement is a mandatory claim-processing rule turns on whether Congress intended to exclude the traditional equitable exceptions to the exhaustion requirement.

Several features of this statute strongly support the conclusion that Congress intended for the exhaustion requirement to be non-mandatory: the text and structure of the statute, the purpose of the exhaustion requirement, and the legislative history describing the reasons for the First Step amendment to § 3582(c).

First, "the best evidence of Congress's intent is the statutory text." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012).    The § 3582(c) exhaustion requirement is distinguishable from other such requirements found to be mandatory by the Supreme Court in that § 3582(c)(1)(A) does not use mandatory language that defendants "shall" have fully exhausted the claim before coming to court or that the court "shall" not consider a defendant's motion unless the claim is fully exhausted.  For example, in the PLRA, the statute at issue in *Ross*, the mandatory language construed to operate as a jurisdictional bar, absent exhaustion, states that "[n]o action *shall* be brought . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis supplied).  Similarly, in Title VII of the Civil Rights Act, the statute at issue in *Fort Bend County*, the mandatory language construed to operate as a mandatory claim-processing rule, states that "[a] charge under this section *shall* be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1) (emphasis supplied).  Likewise, the statute at issue in *Fleming* before the D.C. Circuit governing review of the Department of Agriculture's enforcement of the Horse Protection Act, 15 U.S.C. § 1821 *et seq.*, was construed to operate as a mandatory claim-processing rule, due to the text stating that "a person *shall* exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction."  7 U.S.C. § 6912(e) (emphasis supplied).

In contrast, § 3582(c)(1)(A) does not use the word "shall" or similar mandatory language, such as directing that a court "shall not" consider a defendant's sentence reduction motion unless the claim has been fully exhausted or authorizing consideration of a defendant's sentence reduction motion "*only if*" or "*only after*" the defendant has fully exhausted all administrative rights." Instead, the discretionary nature of the authority provided by this statute is confirmed by its use of the permissive verb "may" preceding the phrase "reduce the term of imprisonment." The Supreme Court "has 'repeatedly observed' that 'the word "may" clearly connotes discretion.'" *Biden v. Texas*, 597 U.S. 785, 802 (2022) (quoting *Opati v. Republic of Sudan*, 590 U.S. 418, 428 (2020), and collecting cases). Then, as a matter of structure, § 3582(c)(1)(A) sets out what a court must consider in resolving motions for sentence reductions, namely, the term of imprisonment "may" be reduced "after considering the factors set forth in section 3553(a) to the extent that they are applicable," and the court "finds that (i) extraordinary and compelling reasons warrant such a reduction" or that (ii) certain age-related criteria have been met, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." This statutory provision is infused with discretion, not only in the consideration of factors and in making findings, but also in the limited nod to the administrative process of only 30 days for consideration of a defendant's motion by the warden. 18 U.S.C. § 3582(c)(1)(A). This is a thin reed to rest an interpretation that Congress manifested an intent to abrogate equitable exceptions to the exhaustion requirement, rather than incorporating standard administrative-law exceptions. *See Ross*, 578 U.S. at 642 n.2 (noting that "an exhaustion provision with a different text and history from § 1997e(a) might be best read to give judges the leeway to create exceptions or to itself incorporate standard administrative-law exceptions," but "[t]he question in all cases is one of statutory construction,

which must be resolved using ordinary interpretive techniques." (citing 2 Richard J. Pierce, Administrative Law Treatise § 15.3 (5th ed. 2010)).

The purpose of the exhaustion requirement further supports the view that the statute is a non-mandatory claim-processing rule. As then-District Judge K.B. Jackson observed, "'[g]enerally, Congress imposes exhaustion requirements in order to serve the twin purposes of protecting administrative agency authority and promoting judicial efficiency[,]' but 'the hybrid requirement in this statute—either exhaust or wait 30 days—substantially reduces the importance of the first purpose, as it allows a defendant to come to court before the agency has rendered a final decision.'" *Johnson*, 464 F. Supp. 3d at 29 (alterations in original) (quoting *United States v. Haney*, 454 F. Supp. 3d 316, 321 (S.D.N.Y. 2020)). Indeed, the exhaustion requirement at issue here does little to protect agency authority because the Bureau of Prisons "has no power to reduce a defendant's sentence unilaterally, but only to file a motion requesting such a reduction." *Morris*, 2020 WL 2735651, at *5.[9] Moreover, while administrative exhaustion requirements generally may further judicial efficiency by giving the administrative process the opportunity to result in relief, thereby obviating the need for district court review, that policy appears barely credited in § 3582(c), given that a defendant may seek district court review after 30 days of the warden's receipt of defendant's motion, no matter whether a warden is still considering the motion or the motion is subject to administrative appeal. Somewhat ironically, reading the exhaustion requirement as a mandatory claim-processing rule undercuts judicial efficiency since this may oblige courts "to consider each such motion twice, first to conclude that the exhaustion provision

---

[9]     In any event, the First Step Act evidences little congressional concern about conserving judicial resources as defendants may file compassionate-release motions with no limitation as to frequency nor a heightened requirement for second or successive motions. *Cf.* 28 U.S.C. § 2255(h) ("A second or successive [habeas] motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain . . . .").

is not satisfied, and then again, days or at most a few weeks later, to reach the merits once the requisite time has elapsed." *Haney*, 454 F. Supp. 3d at 322.

Finally, the impetus for the First Step Act strongly indicates that Congress did not intend to create a substantial barrier to filing compassionate release motions. The D.C. Circuit observed that "a Congress dissatisfied with the stinginess of compassionate release grants deliberately broadened its availability" in the First Step Act. *United States v. Long*, 997 F.3d 342, 359 (D.C. Cir. 2021). Congress seems especially unlikely to have intended to deny defendants equitable exceptions to the exhaustion requirement in "the section of the First Step Act that altered the Section 3582(c)(1)(A) . . . titled 'Increasing the Use and Transparency of Compassionate Release.'" *Morris*, 2020 WL 2735651, at *5 (quoting Pub. L. No. 115-391, 132 Stat. at 5239). That the exhaustion requirement only imposes a thirty-day rule "unquestionably reflects congressional intent for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released." *Russo*, 454 F. Supp. 3d at 271. Requiring defendants to wait thirty days even in situations where exhaustion is futile or presents a hardship would undermine an animating impulse in the First Step Act amendment to make compassionate release more available and to provide defendants with the opportunity for prompt judicial review.

In short, congressional intent, as shown through the text, purpose, and context of the First Step Act indicates no intent to deny defendants the benefit of traditional administrative-law exceptions to the exhaustion requirement.

### B.    Defendant's Failure to Exhaust Administrative Remedies Is Not Excused

The disposition of the instant motion would be the same regardless of whether the statutory exhaustion requirement were mandatory, with no exceptions allowed, or nonmandatory, with equitable exceptions allowed for good cause, such as futility or hardship. Even when a statutory administrative exhaustion requirement is nonmandatory, the statutory text is respected by requiring

exceptional circumstances or other equitable reasons to find that exhaustion may be excused. *See Commc'ns Workers of Am. v. Am. Tel. & Tel. Co.*, 40 F.3d 426, 432 (D.C. Cir. 1994) ("The general rule in this circuit is that the exhaustion requirement 'may be waived in only the most exceptional circumstances." (quoting *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d 163, 168-69 (D.C. Cir. 1983)); *Niskey v. Kelly*, 859 F.3d 1, 7 (D.C. Cir. 2017) ("Because administrative exhaustion requirements are not jurisdictional, however, an employee who missteps in the process may avoid dismissal if he qualifies for equitable relief from the deadline by demonstrating good cause for the procedural failure."). Here, the government has not waived or forfeited the administrative exhaustion requirement, *see* Gov't's Opp'n at 5, and defendant has not attempted to establish good cause as to why the exhaustion requirement should be excused nor offered any argument that exhaustion is futile. Nor can he because his claims have not been presented to the warden. Nor does he face an imminent release date that might create urgency, since he is serving four concurrent life sentences, so any delay would not render the available relief ineffective.

Furthermore, none of defendant's arguments present circumstances creating a particular urgency that would excuse the lack of administrative exhaustion. Relevant changes in law, sentencing disparities, defendant's purported rehabilitation, his current health condition, and his release plan do not necessitate urgent action warranting waiver of the administrative exhaustion requirement. Defendant reports that "[h]is mother suffers from dementia" and asserts that "his presence is essential," Def.'s Mot. at 4; however, he does not contend that his mother's health condition requires urgent attention or explain why his three siblings, *see* PSR ¶ 229, or other family members are incapable of providing adequate care.

Though the exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A) is nonjurisdictional and nonmandatory, here, where the government has timely asserted a challenge based on failure to

exhaust and defendant has presented no justification for why his unexhausted motion should be considered under traditional equitable exemptions, the statutory exhaustion requirement has not been satisfied.  Analysis of plaintiff's motion need go no further.

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion for compassionate release is denied.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: February 2, 2026

_____
**BERYL A. HOWELL**
United States District Judge